Louis L. Friedman, J.
This action was brought by the plaintiff, as administrator of his deceased wife’s estate, to recover damages occasioned by reason of her death, allegedly caused by malpractice occurring during the delivery to her of a child. The delivery took place at the hospital of the defendant, Maimonides Hospital of Brooklyn, hereinafter referred to as “ Maimonides ”, The defendant Prostkoff was the physician who performed the delivery, the defendant Evans was the nurse-anesthetist who administered the anesthetic, and the hospital was brought in under the theory of respondeat superior, the nurse having been its full-time employee.
The trial before the court and a jury extended over a period of three weeks. Each of the defendants was represented by different counsel. The jury’s verdict was in favor of plaintiff against the defendant Prostkoff for the sum of $60,000, and in favor of the defendants Evans and Maimonides.
Motions by the defendant Prostkoff to set aside the verdict as against him, and by the plaintiff to set aside the verdicts in favor of the successful defendants, are now before this court for determination. However, since such motions were made, the plaintiff and the defendant Prostkoff have settled and adjusted the potential liability of said defendant, for the sum of $30,000, so that the motions made by him need no longer be considered. This decision therefore deals only with the motions of the plaintiff to set aside so much of the verdict as is in favor of the two *378 successful defendants. The court has been advised that as part of the settlement, a conditional release is to be executed and delivered, plaintiff thus reserving his rights as against the other defendants.
The court is convinced that this verdict must be set aside and that there are many reasons justifying the court’s action in so doing. Summarized, the court is convinced that (1) the verdict is contradictory of the jury’s verdict as to the defendant doctor, since by said verdict they found that malpractice did in fact take place; (2) the verdict is the result of passion and prejudice; (3) the verdict may be somewhat attributed to the court’s own error in permitting the introduction into evidence of certain pathological and photographic slides; (4) the verdict was caused by unfair and unjustified remarks made during summation by one of defendants’ counsel and by'-some of the tactics employed during the course of the trial; (5) the verdict is a result of perjured testimony; and (6) a miscarriage of justice has taken place which should be rectified by this decision.
The decedent, a young woman about 33 years of age, married in February, 1951 and mother of a child who was born at the end of that year, was in her approximate ninth month of pregnancy on April 28, 1955. At about 6:45 on the morning of that day, she and her husband had breakfast together, preparatory to his leaving for his place of employment. About 8:00 a.m, shortly after he had left for work, she began to experience labor pains, called the defendant Prostkoff who had been taking care of her prenatal condition, and was instructed by him to go to the hospital of the defendant Maimonides for the purpose of giving birth to her expected child. She was there examined by him. He testified that such examination revealed that the unborn child was suffering from fetal distress, since there was a faint heart beat as well as a leakage of meconium through the birth canal. The decedent was immediately prepared for the delivery, taken into the delivery room, and an oral request made for the services of someone in the hospital to administer the anesthesia. This was the usual procedure. The proof shows that there was no set practice with respect to who would be assigned, but anyone of the anesthetists available would respond to the call. Although this hospital employed about five or six anesthesiologists, they were not used for delivery cases, absent -complications, but ordinary deliveries used the services of nurse-anesthetists employed by the hospital, of whom there were approximately six, defendant Evans being one of them.
The office of the anesthetist was alongside of the delivery room and they were called merely by raising the voice and *379 calling for one of them. When the request in this case was made, the defendant Evans immediately responded to the delivery room, was told by Prostkoff that the baby was in distress and that 100% oxygen was to be immediately administered to the mother. This was done by placing an inhalator mask over the face of the patient. Although it was customary and exceedingly important that information be obtained as to whether a patient about to be given an anesthetic, had partaken of any food within a reasonably short time before administration of the anesthesia, no such inquiries were made of the decedent. The failure to do so is ascribed to the supposedly emergency condition of the unborn child. Nevertheless, it was admitted by all defendants that one of the dangers from the administration of anesthesia, is the frequent incidence of vomiting, and that a large percentage of deaths following anesthesia, are due to this cause. After the mask was placed over her face, the oxygen was fed to her through this mask by means of a tube connected to it, which led from a tank containing such oxygen, and it was administered by turning a valve on the oxygen tank. In the meanwhile, Prostkoff finished scrubbing and putting on his surgical gown and then proceeded with the delivery. When he was about to perform the episiotomy (cutting the vagina to prevent tearing) Prostkoff. instructed nurse Evans to put the patient to sleep. He gave no further instructions as to the type of anesthesia to be used or as to the method of administering same, although it was admitted that there were many different types and methods of anesthetizing a patient.. It is the contention of defendant Evans that upon receiving the instructions to put the patient to sleep she then reduced the flow of oxygen and started the flow of nitrous oxide-ether and oxygen, so that the patient was being given 80% of nitrous oxide-ether and 20% of oxygen. This continued for about five minutes and the patient was delivered of her child. During all of this time, nurse Evans sat on a chair alongside of the delivery table, regulating the valves on the three tanks from which ether, nitrous oxide, and oxygen were being separately drawn. There is no testimony by her or by any other witness, that after putting the mask on the patient’s face, she ever again put her hands, or either of them, on or near the mask, although as was later discovered from the testimony of one of defendant’s own experts, this was a most important procedure to follow.
When the child was born, it was covered with meconium, and the physician immediately began working with this child so that it would remain alive. What occurred at that time is, of *380 course, solely within the knowledge of those who were in the delivery room, other than the decedent, she being under the influence of the anesthetic. The testimony given on the examination before trial and upon the trial, is to the effect that approximately two minutes after the baby was horn, the patient gave several gasps and died. The mask was immediately pulled from her face by nurse Evans. Prostkoff testified that he immediately saw large amounts of vomit coming from the patient’s mouth. The testimony of the nurse as to what occurred, as well as the testimony of Prostkoff as to what he saw when the mask was ripped off of the decedent’s face, leaves no doubt that this occurred. This is so, even though an attempt was later made by the nurse to deny that she saw any gastric contents coming up out of the patient’s mouth when the mask was first pulled off. She testified that it was only after artificial respiration was employed, that she then saw the vomit, thus implying that it was the artificial respiration which was responsible for forcing out the undigested food. Dr. Prostkoff, however, was positive in his testimony that he noticed the vomit immediately when the mask was pulled off, and before any attempt was made to revive the patient. The immediate impression of those in attendance was that she had suffocated as a result of inhaling these gastric contents into the lung after they had been brought up from the stomach. There was no dispute upon this trial that the danger from vomit is a very real and frequent one and that all proper means must be taken when administering anesthesia to prevent such an occurrence. One of defendant’s own experts, Dr. Irving Pallin, Chief of the Anesthesiology Department at the Jewish Hospital and concededly one of the most eminent men in his field, testified that in order to keep the air passages open, the customary, proper and essential practice was that the anesthetist keep his or her hand under the patient’s chin at all times while the anesthesia is being administered, thus keeping the head back and at the same time being able to detect any kind of movement which would indicate the beginning of vomiting. It needs no medical expert to visualize, that a patient lying on his or her back in an unconscious state, with a completely closed mask covering the nose and mouth, is in real danger if vomiting occurs, because each intake of breath will of necessity draw with it these disgorged gastric contents, and there was no dispute that such an occurrence leads to a blockage of the air passages, thus resulting in a choking death.
After the mask had been pulled off the face of the decedent, an effort was made to intubate her- +Lat is to pass a tube down *381 her throat and into the air passages in order to draw out these gastric contents which were there lodged. Defendant Evans tried at first with a tube which she had with her, and when she was unable to achieve any result, another physician was called in to assist her. He withdrew the nurse’s tube and inserted one of his own. The patient could not be revived despite all efforts at artificial respiration, and was pronounced dead about 15 or 20 minutes later.
Thereafter followed a series of most unusual and unsatisfactorily explained events. The husband was sent for and was informed by defendant Prostkoff that his wife had died as a result of inhalation of these gastric contents. An autopsy was performed that afternoon, and a gross examination of the organs of the decedent led to a diagnosis to the same effect, since large amounts of such gastric contents were found in the breathing passages and in the lungs. The autopsy is said to have been performed by an assistant medical examiner, who signed the death certificate attesting to that cause of death. This death certificate was filed 2 days after the death occurred, and the report of the medical examiner filed in his office, also concluded that death was caused by reason of the inhalation of these gastric contents. Although this Assistant Medical Examiner claimed that he performed the autopsy, the court is convinced that he did not do so. Appended to and made part of the hospital records in evidence, is a report of this autopsy, and at the very top of the page, labeled 1 ‘ necropsy report ” is a printed word “ Prosector,” with a blank line where the name could be inserted. The dictionary shows, and it was conceded upon the trial, that the word ‘ ‘ prosector ’ ’ means the person who actually performed the autopsy, and the name which was inserted in that blank space was not the name of the Assistant Medical Examiner, but the name of one Dr. Bubenstein, thereafter discovered to be an interne employed by the hospital. Another record offered in evidence during the course of the defense, was a book owned by the hospital which showed the name of every decedent upon whom an autopsy had been performed. Those cases which were supposedly medical examiner cases, were so indicated. Nevertheless, although this entry had alongside of it the letters “ M. E. ” indicating medical examiner, the name of the person performing the autopsy was entered as Dr. Bubenstein. It was the practice in the hospital for the internes to perform autopsies, although it was claimed that they did not do so in medical examiner cases. The record in evidence showed that Dr. Bubenstein performed many autopsies in this hospital. Despite all attempts to show otherwise, the court is *382 convinced from the documentary proof, that it was Dr. Ruben-stein who performed the autopsy and not the Assistant Medical Examiner, and this assistant merely adopted and accepted the findings and conclusions of the hospital personnel, when' the report was filed in the Medical Examiner’s office. In any event, that report showed that the cause of death was the cause claimed upon this trial by the plaintiff, to wit, inhalation of gastric contents, causing collapse of the lungs.
More unusual events followed. In several places in the hospital record there were indications that instead of receiving a mixture of nitrous oxide-ether and oxygen (the usual anesthetic) the patient had received merely nitrous oxide. In one instance, a change was made in the record in ink, to add in the chemical symbol for the word oxygen. It was conceded upon the trial that the administration of nitrous oxide without the addition of oxygen would be sufficient to cause death.
More unusual events followed, showing an attempt to evade responsibility for the death which occurred.
Six weeks after the date of death, this lawsuit was started charging the defendants with malpractice. About five months later, a new or amended death certificate was suddenly filed with the Board of Health. It was accepted for filing on the basis of a letter from the Assistant Medical Examiner who claimed to have performed the original autopsy, in which letter he stated that there was an error in the original diagnosis, and that the new cause of death was 11 amniotic fluid embolism. ’ ’ The reason for the change was said to be a microscopic examination and report of the organs of the decedent. This report is in evidence. It was claimed upon the trial, that in the latter part of May or the beginning of June, shortly before the lawsuit was started, this microscopic examination took place, and that upon such examination it was discovered for the first time that contents in the lungs of the decedent showed evidence of amniotic fluid emboli, and that some of these emboli were found in even the smaller bronchi of the lungs. It was contended that it was these emboli which caused the obstruction of the breathing passages and of the lungs and which resulted in death, and that the original diagnosis of inhalation of gastric contents was a mistake. When pressed for an explanation as to the finding that there were such gastric contents in the lung when the gross autopsy was performed, the explanation given was that these contents might have gotten into the lung as a result of contractions of the decedent during her last stages of life, all however caused by the amniotic fluid emboli obstructions. The Assistant Medical Examiner who claimed to have performed *383 the autopsy, who signed the original death certificate, and who, seven months after the death, signed and filed the amended death certificate, claimed that it was he who made the microscopic examination and dictated the findings. The court does not believe that he. did so, because everything on the trial points to a different conclusion, and the court is satisfied that the microscopic examination and microscopic report, if in fact one was ever made prior to the institution of the lawsuit, was performed by the hospital personnel. The court is further convinced that no microscopic examination ever took place prior to the institution of the lawsuit, and that this fact is best proven by the date of the letter from the Assistant Medical Examiner to the Department of Health (Nov., 1955). Although the Assistant Medical Examiner claimed that he had the time in the latter part of May or early June to travel to the hospital and make the microscopic examination and then dictate the very detailed report which is now in evidence, he contended that he did not then have the time to dictate the three-line letter to the Health Department in which the amended death certificate was enclosed, and it was this explanation which he gave as his reason for failing to file the amended death certificate, purportedly prepared in the latter part of May or the early part of June, until the month of November, 1955. His explanation is incredible, and the court is convinced that the alteration of the hospital records as well as the changes in the records of the Health Department and in the records of the Medical Examiner’s office, were all part of an attempt to evade responsibility for the unnecessary death of this decedent. The participation of the Assistant Medical Examiner in this matter, is attributable to his personal friendship with the hospital personnel, as well as to the fact that he had originally certified to the performance of an autopsy, which in fact was performed by someone else.
In addition to this amended death certificate, other changes were made in the hospital record, and the newly decided upon cause of death was inserted therein. Furthermore, changes were made in the autopsy report, and although there are three copies of this autopsy report in evidence, no two of them are similar. The one offered by plaintiff, a photostatic copy, was apparently secured from the Medical Examiner’s office prior to the time that the amendment or change in the report was made by the Assistant Medical Examiner; the second one contained the changes in ink showing the supposedly amended cause of death; while the third one, in the Manhattan office, is not an exact copy of either of the other two. There are many other comments which might be made about these reports and the *384 method by which they are kept, but to say the least, they all point to- but one conclusion, and that is that an attempt was made to absolve the defendants from liability for their actions in this case. One of the matters concerning which testimony was given, was that a death resulting from an amniotic fluid embolism would occur within two minutes after the emboli reached the lungs. The birth, is said to have occurred at 10:02 a.m. and the death at 10:04 a.m. (officially pronounced dead about 15 minutes later). One of the experts produced by the defendant testified that the time spacing could not have been as much as 10 minutes or any such time, because the emboli reaches the lungs in a matter of seconds. Apparently discovered for the first time on the trial, were several entries in the hospital record which indicated that instead of the birth taking place at 10:02 it actually took place at 9:55 a.m., and this difference in time between the birth record as contained in so much of the hospital chart as applies to the newborn infant, and the time as it is contained in the hospital record of the decedent herself, lends great support to the theory advanced by the plaintiff upon the trial, that hospital records were altered, doctored, or tailored so as to present a defense to this lawsuit. If the birth actually took place at 9:55 instead of at 10.02 a.m., then the defendant’s contention, that the decedent died from this embolism within two minutes after the birth, is completely dissipated because death would have taken place at the latest by 9:57 or 9:58 a.m. The fact that the death occurred at 10:04 lends great support to the theory adopted at the time of the original autopsy, and that is that the patient died as a result of inhaling the vomitus material.
Amniotic fluid is the fluid in which the unborn child floats during the course of pregnancy. Meconium, previously referred to, is the discharge from the body of this unborn infant while it is still nestling in its mother’s womb, and usually matter such as baby hairs (called lanugo hair) discharged from the infant’s body and similar material are found contained in this amniotic fluid. When the afterbirth or placenta, is discharged from the mother’s body shortly following the birth of the child, there are many venous sinuses located behind the outer layer of the placenta, which are opened as a result of this tearing away or discharge of the placenta. These sinuses are located behind the placenta, and the contents of the amniotic sac can only reach these venous sinuses in the event that a rupture in the sac takes place. While it was claimed upon the trial that such a rupture did take place, the rupture to which reference was made was the usual rupture at the situs of the birth canal, *385 and not a rupture behind the sac where the venous sinuses are located. Yet, it was claimed by the defense, that it was into these venous sinuses that the amniotic fluid and its emboli were drawn, and of course through the various veins of the body until they reached the lung where they caused the obstruction which ultimately resulted in decedent’s death.
All of the medical books produced upon the trial and to which reference was made, and all of the experts who were called, conceded that all known medical literature showed that there was less than 50 known deaths throughout the world, from amniotic fluid embolism, and that it was only about 18 or 19 years ago that the first such diagnosis was made. None of the experts had themselves ever experienced any such cause of death, prior to the one claimed to have taken place in this instance. Although this trial took place four years after this supposedly unusual occurrence, there was no testimony which indicated that this death had ever been reported in any medical literature, and certainly, if an amniotic fluid embolism was the cause of death in this case, the first such known death in this city, it would have been written up in one of the medical journals during this four-year period. It is rather farfetched to assume that, bearing in mind the cause of death as given on the original autopsy, and taking into consideration the millions of births which take place each year, that this so unusual a cause of death occurred in this case and yet was never reported in any medical literature. But what is equally important to the determination of this motion to set aside the verdict in defendant’s favor, is the fact that the jury apparently rejected the second diagnosis as the cause of death of this decedent, despite the presence of many hired experts produced by the defendants. The jury was told, during the charge, that if they found that the sole cause of death was attributable to amniotic fluid emboli, that their verdict would have to be for all of the defendants, and since the jury did find for the plaintiff against one defendant, it must be assumed that they rejected the contentions of the three defendants.
It was evident throughout this trial that the plaintiff was going to have a great deal of difficulty in presenting his proof. Attempts to elicit evidence were met with a continuous stream of objections, primarily from the two defendants’ attorneys whose clients were favored with a verdict in this case. There were repeated objections and despite adverse rulings, the lawyers persisted in repeating such objections and arguing about the rulings made thereupon. On one occasion, after one attorney had been told that his objection had been noted, he *386 persisted in arguing about it to the point where the court was obliged to order him to take his seat. The attorney refused to be seated, insisting that he would even fight off any court ■ officers who attempted to put him in his place. Although the following day he apologized for his actions to both the court and the court officers who had attempted to maintain order, his conduct was but one of a series of incidents which took place, which continually interrupted the proof and which deprived the plaintiff of a proper trial in this most unusually difficult case. An attempt was made throughout the trial by the other defendant’s attorney, to create an atmosphere of sympathy for the nurse-anesthetist. She was a rather bright young lady who had received her original training in the schools in her home State in Virginia from which State she had moved to New York City. Following her employment by the defendant Maimonides, she took a special course of training in the field of anesthesia at the Kings County Hospital School of Anesthesiology, and it was following that course of education, that she was employed as a nurse-anesthetist at the Maimonides Hospital. Repeated questions were put to her while she was on the witness stand, in an attempt to create an atmosphere that because of her race, that the end result of a verdict against her would be to deprive her of her entire future. This improper procedure was reiterated during the summation, when the jury was told by her attorney as follows: ‘ ‘ that the nurse’s future is involved; that you are not to stamp the hospital as a fraud ; that you are not to brand the doctor or to brand the nurse as a malpractieer or to put the stamp of malpractice on the nurse, or to brand her or to destroy her future.” This attempt at evoking sympathy in behalf of this nurse was so flagrant, that the court was called upon to refer to the occasion during its charge to the jury, and although the jury was warned that it was not their function to determine what would be the future result of their verdict and that they were not called upon to hurt this young lady’s future, it was evident that the remarks made by the attorney had the desired effect, and that the jury were unable to erase from their minds the remarks to which they had listened. While these actions were undoubtedly due to their zeal in defense of this lawsuit, it must be remembered that they took place in the presence of the jury. Defense counsel made many motions to strike out answers which had already been given, even though the court had already ruled that the questions were proper. There were motions made for a mistrial in the presence of the jury, even to the extent on one occasion of making an unwarranted attack upon statements made by the *387 court and of the court’s fairness in connection therewith. They insisted upon repeating the same questions and eliciting the same answers in different ways, all tending to prolong this trial. Considering the fact that some of the jurors were in their fourth week of jury service by the time the trial was completed, it is evident that all of these things must have had the desired effect upon them.
During the course of the trial, defendant offered in evidence the photographic and microscopic slides, allegedly of the decedent. An objection to their introduction was overruled and they were displayed to the jury through the use of a slide projector and during the course of their display they were described in detail by many experts. These slides must have had some effect on the jury, even though they did reject the ultimate contention of the defendant that the death occurred solely as a result of amniotic fluid embolism. When the slides were first admitted, and when they were described in detail to the jury, the court was under the impression that the explanation given by Dr. Kantrowitz, Chief Pathologist at Maimonides, of the course of procedure in connection with the handling of these slides, had been followed in this instance. Upon cross-examination of Dr. Kantrowitz, however, after the slides had already been exhibited to the jury, it developed that he had been in Europe on a vacation during the time when this autopsy was made and even when the microscopic examination was supposedly performed, and although he described the course which would usually be pursued in preserving and preparing them, there was no evidence that the practice had been followed by the doctor’s assistants, particularly during his absence. The court has come to the conclusion that it was error to admit these slides in the absence of proof of their possession during the six or eight weeks which elapsed (assuming defendant’s testimony of when the microscopic examination took place is correct) between the gross autopsy and the microscopic examination.
The Assistant Medical Examiner testified upon the trial that it was he who made the microscopic examination and dictated the report. The court does not believe that he did so. The microscopic report wras undoubtedly prepared shortly before the letter of November, 1955 and was undoubtedly dictated by the employees of Maimonides. This is evident from the fact that while it bears an identification number, it is not the number of the Medical Examiner’s office, but the identification number of the hospital. In addition, if it was dictated by the Assistant Medical Examiner as he claimed, it is unusual that the original *388 report was kept by the hospital, while only a carbon copy was filed in the Medical Examiner’s office. In addition, no .explanation was offered as to why the unusual procedure was followed of having the Assistant Medical Examiner travel to the hospital to examine the slides in their laboratories, rather than having the slides delivered to the official office of the Medical Examiner where they could be examined in the laboratories of this agency of the City of New York. This became significant in view of the testimony of Dr. Kantrowitz and other experts, that nitrous oxide-ether, administered without the addition of oxygen, would produce asphyxia and result in death. It became more important when the report of the microscopic examination of the brain was examined, for in the paragraph referring to that organ, it was indicated that there was congestion of the white central matter of the brain, and all of the experts agreed that such congestion would indicate asphyxiation.
In a malpractice case, a plaintiff has the burden of proving by medical testimony, a departure from accepted practice and procedure. The difficulty in securing medical experts to testify against other members of their profession has long been recognized. Plaintiff did procure the services of an expert, and although he was subjected to relentless cross-examination for three days, the jury apparently accepted his opinion. They were instructed during the charge of the court that if they did not believe his testimony.or did not agree with his conclusion, that they were bound to find for all the defendants. Their verdict in favor of the plaintiff as against one of the defendants, indicates that they accepted plaintiff’s experts’ testimony and proof. The difficulty with the verdict, however, is the fact that the jury held the doctor responsible, while absolving the nurse and her employer. The theory of plaintiff’s case was the improper administration of anesthesia and the failure to take the usual precautions before and during its administration. If Dr. Prostkoff could be found responsible for having failed to prepare for, to direct, or to supervise the anesthetic part of the delivery, then certainly the active tort-feasor and her employer are equally, if not more, responsible for the results of their malpractice. A verdict in favor of Dr. Prostkoff but against the nurse and the hospital, might have been properly acceptable under the proof in this case since the' negligence charged against the doctor was his failure to take steps which he should have taken but did not. Equally acceptable, although undoubtedly an injustice, would have been a verdict in favor of all three defendants, since the jury could have refused to accept the testimony of plaintiff’s expert. But no verdict in favor of *389 the nurse and the hospital, who were the active tort-feasors, may remain undisturbed, when the jury has said by its verdict that the passive tort-feasor (the doctor) is liable for the malpractice which took place. The case was submitted to the jury upon the theory that if the defendant nurse was held responsible, the hospital must be responsible under the doctrine of respondeat superior. (See Bing v. Thunig, 2 N Y 2d 656; Morwin v. Albany Hosp.,1 AD 2d 582.)
The court’s conclusions hereinbefore set forth are supported by numerous authorities, some of them being as follows: in Tuthill v. De Vries (265 App. Div. 881 [2d Dept.]), where the question of the conduct of the defendant’s trial counsel was being considered, the court said: ‘ ‘ The conduct of the defendant’s trial counsel and its possible prejudical effect on the result attained warranted the setting aside of the verdict in the interests of justice. (Cherry Creek Nat. Bank. v. Fidelity & Cas. Co., 207 App. Div. 787, 790; Summers Coal & Lumber Co., Inc., v. Bagshaw, 240 App. Div. 709; Passzehl v. Metropolitan Distributors, Inc., 259 App. Div. 1050.) ”
While the court should ordinarily not disturb a jury’s determination on pure questions of fact, where, as here, the documentary evidence indicates that an injustice has taken place, the court should not hesitate in exercising its prerogative.
In Zukas v. Lehigh Val. Coal Co. (187 App. Div. 315) the trial court, in spite of his belief that the verdict was procured by perjury, refused to follow that belief to its conclusion, and suggested that the Appellate Division pass upon it. The majority opinion held that since the Trial Judge believed that the verdict was improper, that ‘ ‘ he should have had the courage of his conviction and set it aside, and not, as apparently he did, passed the problem along to us for solution.” The decision was 4 to 1, presiding Justice Jenks concurring in the reversal, but suggesting that the better practice would be to send it back to the Trial Justice to pass upon, stating that if the trial court 11 be dissatisfied with the verdict as against the Aveight of evidence or contrary to the evidence ” it should grant a new trial and 1 ‘ it is its duty to do so.”
In Harris v. Brooklyn & Queens Tr. Corp. (249 App. Div. 749) the same court said that “ The trial justice was in the atmosphere of the trial ’ ’ and if “he thought that the verdict was against the weight of evidence, he would have found Zukas v. Lehigh Valley Coal Co. (187 App. Div. 315, 319) applicable.”
In Post v. Kerwin (150 App. Div. 321, 322) the court said that a verdict may be set aside: “ And by such action the trial judge does not invade the province of the jury, for he but inter *390 feres to afford the submission of the facts to another jury, not in denial but in recognition of the principle that the jury are the ultimate judges of the facts.”
The court stated in Bauer v. Montague Mailing Mach. Co. (163 App. Div. 589, 591): “ But juries may be led into error, not alone from partiality or bias, but from the suggestive arts of advocates. The trial judge must, therefore, scrutinize what is said, and how it is told, in view of the interest of the witnesses, so that the verdict shall do substantial justice. (Ferguson v. Gill, 74 Hun 566.) This power is necessary and its exercise so salutary that no rules have been declared rigidly defining the conditions of granting a new trial.” The court further stated: “ The action of the trial court, with the witnesses before him, must be deferred to by a reviewing court, which can only read their testimony in print. To warrant reversal of such an order, the proofs must be so strong in favor of the verdict that we can say with a reasonable degree of certainty, that the trial court’s conclusion was wrong. (Aldridge v. Aldridge, 120 N. Y. 614.) ”
In Roistacher v. Hurley (34 N. Y. S. 2d 752, afifd. 266 App. Div. 688) Mr. Justice Hallinan, then sitting in the Supreme Court, Kings County (now a Justice of the Appellate Division, 2d Dept.) had before him a motion to set aside a verdict in an action for wrongful death. The jury had rendered its verdict in favor of defendant and the motion was made by plaintiff to set it aside. Discussing the proposition enunciated in Scheuerman v. Knapp Coal Co. (238 App. Div. 874) that the court should be hesitant about setting aside a jury verdict in favor of defendant in a tort action, the learned Justice held, nevertheless, that an acceptance of the verdict would result in an injustice, and granted the plaintiff’s motion to set aside the verdict and for a new trial. (See, also, Kohlmann v. City of New York, 8 A D 2d 598.)
The court is satisfied that it erred in the admission of the photographic and microscopic slides, since no foundation for their admission was properly laid. Where the court is satisfied that it has committed error, and that such error has in some respects motivated the verdict, it should not hesitate to set the verdict aside.
As was said by Mr. Justice Frankfurter in Henslee v. Union Planters Bank (335 U. S. 595, 600): “ Wisdom too often never comes, and so one ought not to reject it merely because it comes late.”
In Stewart v. City of New York (4 A D 2d 791) the Appellate Division (2d Dept.) held that the Trial Justice who saw and *391 heard the witnesses, had the right to set aside the verdict if he felt that it was contrary to the weight of the credible evidence. It is not intended that this be a holding that a court has the right to substitute its judgment for that of a jury. Even though the court may feel differently, the parties usually have a right to have a jury determine factual issues which exist. But where, as in this case, the jury has rejected the entire defense of amniotic fluid embolism, has accepted the plaintiff’s theory of the cause of death, and at the same time has absolved the two active tort-feasors while holding the passive tort-feasor liable, it is more than just substituting the court’s judgment for that of the jury, when the court sets aside the verdict.
The jury’s verdict in favor of the plaintiff against only one defendant for the sum of $60,000 was a proper estimate of the amount to which plaintiff was entitled. Together with interest from the date of death, the total recovery would have been approximately $75,000. The defendant Prostkoff, by way of settlement, has paid $30,000 in exchange for a conditional release. Thus, plaintiff’s claim for damages has not yet been fully satisfied. Were it otherwise, and plaintiff were fully compensated, then even though the court feels as it does about so much of the verdict as is in favor of two of the defendants, there would have been no justification for granting plaintiff’s motion. Under the circumstances, the court believes that the relief to be given herein is proper.
For all of the reasons herein stated, the motion of the plaintiff to set aside the verdict in favor of the two defendants, Evans and Maimonides, is in all respects granted. The action is severed by reason of the settlement with the defendant Prostkoff, and the action is restored to the Trial Term, Part I Calendar for a new trial for September 14, 1959.
All sides are directed to be ready to proceed to trial on that date. Submit order.