Richard O. PARKER, a disabled person, and Kathryn Tyler, as guardian of the person and property of Richard O. Parker, a disabled person, Plaintiffs–Appellants,

v.

VANDERBILT UNIVERSITY; Dr. Thomas C. Kreuger; Dr. Stephen Powell; Dr. Clay Alexander; Dr. James Peacock; and Dr. Ildefonso Alcantara, Defendants–Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Nov. 23, 1988.

Permission to Appeal Denied by Supreme Court Feb. 27, 1989.

John W. Nolan, III, Earl J. Porter, Jr. and Mary Arline Evans, Nashville, for plaintiffs-appellants.

Frank C. Gorrell, R. Dale Grimes, Bass, Berry & Sims, Nashville, for defendants-appellees Vanderbilt University, Dr. Kreuger, Dr. Powell, Dr. Alexander and Dr. Peacock.

William P. Sutherland, Watkins, McGugin, McNeilly & Rowan, Nashville, for defendant-appellee Dr. Alcantara.

OPINION

CANTRELL, Judge.

This is a medical malpractice action against multiple defendants. Plaintiff Richard O. Parker emerged from surgery with severe brain damage and has since remained in a coma. After the trial judge dismissed the doctors, their hospital-employer, and the director of anesthesia services for the hospital where the accident occurred, the plaintiffs filed a notice of voluntary dismissal as to the other defendants. This appeal followed.

During the evening of June 17, 1984, plaintiff Richard O. Parker was shot in the back with a small caliber handgun as he tried to escape from an armed robber. He was taken to Nashville General Hospital, a hospital operated by the Metropolitan Government of Nashville and Davidson County.

The surgical staff at Nashville General was furnished by Vanderbilt University under a contract with the Metropolitan Government. On the evening in question, four Vanderbilt physicians, Drs. Powell, Kreuger, Alexander and Peacock, were on duty in the operating room at General. Sandra Conner, a nurse anesthetist employed by the Metropolitan Government, and Rebecca Murphy, a student nurse anesthetist at the Middle Tennessee School of Anesthesia, provided the anesthesia services in the operation room. Dr. Ildefonso Alcantara headed the department of anesthesia services for General, but he was not present at the hospital on the evening of June 17, 1984.

At the time of his admission, Mr. Parker was able to walk and his vital signs were stable. After an examination in the emer-

gency room, Mr. Parker was taken to the operating room for surgery.

After Mr. Parker was sedated and given oxygen by mask for approximately five minutes, Ms. Murphy inserted an endotracheal tube into Mr. Parker's throat. The tube was to supply oxygen to Mr. Parker during the operation. The complaint alleges that the tube entered Mr. Parker's esophagus rather than his trachea and he was therefore deprived of oxygen for approximately twelve minutes. Within five minutes, Mr. Parker's blood pressure and heart rate dropped dramatically. His abdomen had been opened and the surgical team noticed that his blood was dark and his stomach distended. As his heart rate continued to drop, the anesthetists administered atropine and bicarbonate and one of the surgeons started pressing Mr. Parker's chest to restore circulation. Ms. Conner removed the endotracheal tube and replaced it with another. At approximately the same time, one of the surgeons opened Mr. Parker's chest and started heart massage. Within seven minutes after Mr. Parker's heart rate began to fall, his blood pressure and heart rate were restored. However, during the twelve minute period when his lungs were deprived of oxygen, he suffered severe brain damage.

Mr. Parker, through his next of kin and limited guardian, filed an action against Nashville General Hospital, the Metropolitan Government of Nashville and Davidson County, Vanderbilt University, five Vanderbilt doctors, Sandra Conner, Rebecca Murphy, Middle Tennessee School of Anesthesia, Inc. and Dr. Alcantara.

On October 8, 1986, the trial court dismissed Dr. Alcantara on a motion for summary judgment. The plaintiffs voluntarily dismissed one of the Vanderbilt doctors and, on June 9, 1987, the trial judge dismissed Vanderbilt University and the remaining Vanderbilt doctors on a motion for summary judgment. The plaintiffs then voluntarily dismissed the remaining defendants. An order to that effect was entered by the trial judge on July 29, 1987.

On July 30, 1987, the plaintiffs filed a motion for a new trial on the claims against Vanderbilt, its doctor employees, and Dr. Alcantara. When the trial judge overruled the motion, the plaintiffs filed a notice of appeal.

### I. The Timeliness of the Appeal

■ Vanderbilt and its doctor employees filed a motion to dismiss the appeal because it was not timely filed. They insist that the motion for a new trial should have been filed within thirty days after the order dismissing the case as to them. On December 9, 1987, this court filed an opinion and an order denying the motion to dismiss. The named appellees subsequently filed a petition to rehear, and this court consolidated the petition with the oral argument on the merits of the appeal.

After considering the petition to rehear, we have concluded that the petition should be denied. We are persuaded that the prior opinion of this court on the motion to dismiss properly addressed and disposed of the issues in the motion. A copy of our prior opinion is attached as an appendix to this opinion.

### II. Vicarious Liability

The cause of action asserted by the plaintiffs is described in the complaint as follows:

> As a result of the careless placement of the endotracheal tube and/or failure to recognize the problem and correct it for so long a period of time, Richard O. Parker suffered profound irreversible brain damage.

Thus, the plaintiffs allege two acts of negligence: the first is the misplacement of the tube, and the second is the failure to recognize the problem and to take prompt action to correct it.

The parties disagree as to whether the endotracheal tube was actually misplaced. Although the record in this court does not show that the tube was misplaced, that is one inference to be drawn from the proof on file. Viewing the record in the light most favorable to the plaintiffs, we will assume that the misplacement of the endotracheal tube can be shown to the jury's satisfaction. See *Taylor v. Nashville Ban-*

*ner Publishing Company,* 573 S.W.2d 476 (Tenn.Ct.App.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979).

As to all the appellees (Dr. Alcantara, Vanderbilt University, Drs. Powell, Kreuger, Alexander, and Peacock), their responsibility for the misplacement of the tube must result from some theory of vicarious liability. We will deal with that aspect of the case first.

### A. The Captain of the Ship Doctrine

One legal theory by which vicarious liability has been placed on a surgeon is the so-called "Captain of the Ship Doctrine." The analogy was first used in the case of *McConnell v. Williams,* 361 Pa. 355, 65 A.2d 243 (1949), where the court said, "He [the surgeon] is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board...." 65 A.2d at 246. Taken to the extreme, this logic would impose absolute liability on a surgeon for the negligent acts of every person connected with the surgery. However, the facts and holding of *McConnell* do not seem to indicate the beginning of a revolution. The court simply held that there was a factual question for the jury as to whether, under familiar agency principles, the obstetrician could be vicariously liable for the negligence of an assisting intern. *Id.* 65 A.2d at 248.

In later cases, the Pennsylvania courts relied on the Captain of the Ship Doctrine to expand the liability of surgeons to acts of subordinates occurring outside of the operating room. *See, e.g., Yortson v. Pennell,* 397 Pa. 28, 153 A.2d 255 (1959). But, in more recent cases, the courts in Pennsylvania have redefined the doctrine so that, now, it more nearly resembles the "borrowed servant" concept. *See Thomas v. Hutchinson,* 442 Pa. 118, 275 A.2d 23 (1971); *Collins v. Hand,* 431 Pa. 378, 246 A.2d 398 (1968). In *Collins,* the court said: "The crucial test in determining whether an employee furnished to another becomes a servant of the one to whom he is loaned

is whether he passes under the latter's right of control with regard not only to the work to be done but also as to the manner of performing it." 431 Pa. at 394, 246 A.2d at 406.

With the concept taking on so many shades of meaning in the state of its origin, it is not surprising that other states have had difficulty in defining it. While referring to the doctrine in several cases, the Tennessee courts have not attempted to formulate a definition. *See Harrison v. Wilkerson,* 56 Tenn.App. 188, 405 S.W.2d 649 (1966); *French v. Fischer,* 50 Tenn. App. 587, 362 S.W.2d 926 (1962). In two unreported cases, the Western Section of the Court of Appeals has rejected the Captain of the Ship Doctrine after failing to find its precise meaning.[1]

■ We are of the opinion that the use of the term "Captain of the Ship" with respect to the liability of a surgeon for the negligent acts of others in or around the operating room is unnecessarily confusing and should be avoided. We think the surgeon's liability for the acts of others should rest on the more familiar concepts of master and servant; "[o]perating surgeons and hospitals are subject to the principles of agency law which apply to others." *Sparger v. Worley Hospital, Inc.,* 547 S.W.2d 582, 585 (Tex.1977).

### B. Master and Servant and Vicarious Liability

#### 1. In General

■ Under Tennessee law, a master is liable for his servant's negligence solely on the doctrine of respondeat superior. *Smith v. Henson,* 214 Tenn. 541, 551, 381 S.W.2d 892, 897 (1964). That doctrine is based upon the principle "that the wrong of the agent is the wrong of his employer." *Raines v. Mercer,* 165 Tenn. 415, 420, 55 S.W.2d 263, 264 (1932). To hold the master/principal liable, it must be established "that the servant or agent shall have been on the superior's business, acting within the scope of his employment." *National*

---

1. *See Harris v. Thomas* (Tenn.Ct.App.), filed in Jackson, May 12, 1983; *Tutton v. Patterson* (Tenn.Ct.App.), filed in Jackson, April 22, 1985,

*rev'd on other grounds,* 714 S.W.2d 268 (Tenn. 1986).

*Life & Accident Ins. Co. v. Morrison,* 179 Tenn. 29, 38, 162 S.W.2d 501, 504 (1942).

■ When does a master-servant relationship exist? The Tennessee cases indicate that "the right to control the 'result' is not determinative of the existence of the relation of master and servant, but the actual control of means and method is." *McDonald v. Dunn Construction Co.,* 182 Tenn. 213, 220, 185 S.W.2d 517, 520 (1945). *See also Sitz v. Bryant,* 184 Tenn. 600, 201 S.W.2d 985 (1947); *Texas Company v. Bryant,* 178 Tenn. 1, 152 S.W.2d 627 (1941). Thus, one test employed to determine whether a person is a servant of another involves an inspection of the amount of control exerted over the "means and method" of the work of the putative servant. *See McDonald,* 182 Tenn. at 220–221, 185 S.W.2d at 520.

### 2. Loaned Servant

■ An employee of one employer may become the servant of another and shift the liability for his negligent acts to the second employer. *See Richardson v. Russom Crane Rental Co.,* 543 S.W.2d 590 (Tenn.Ct.App.1975). The test to determine whether an employee is a loaned servant of another employer has been set out in *Gaston v. Sharpe,* 179 Tenn. 609, 168 S.W.2d 784 (1943). In *Gaston,* the court said:

> [A] servant at a particular time may remain under the control of his general employer for some purposes and yet be under the control of a special employer for others. Likewise it sometimes happens that a particular work in which the servant is engaged may be properly considered as the work or business of both the general employer and the special employer.
>
> The question is difficult. It is considered at some length in Restatement of Agency, § 227. We take the following from Restatement as a satisfactory rule: "Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question,

he is acting in the business of and under the direction of one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case."

179 Tenn. at 614, 168 S.W.2d at 786.

### C. The Appellees and Vicarious Liability

#### 1. Dr. Alcantara

■ Dr. Alcantara was the Chief of Anesthesia Services for General Hospital. He was not on duty or present at the hospital at the time of the operation. The allegations of the complaint do not assert that Dr. Alcantara personally committed any acts of negligence. Therefore, the only basis on which he might be held liable is the theory of respondeat superior.

We are of the opinion that Dr. Alcantara is not responsible for the acts of the nurse anesthetists. The undisputed proof shows that they were not doing the business of Dr. Alcantara. They were serving the interests of General Hospital. Thus, "[t]he underservants through whom [he] discharged [his] duties were not [his] servants, but the servants of the corporation." *Gamble v. Vanderbilt University,* 138 Tenn. 616, 634, 200 S.W. 510, 514 (1918). *See also Vance v. Hale,* 156 Tenn. 389, 2 S.W.2d 94 (1928).

#### 2. Vanderbilt University

■ Again, the allegations against Vanderbilt University assert that it is liable for the negligence of its employees, the doctors on duty at General Hospital. Assuming for the moment that the doctors' negligence can be established, can Vanderbilt be liable under the rule of respondeat superior?

The trial judge held that the doctors on duty were the loaned servants of General

Hospital. Thus, Vanderbilt could not be liable for their acts while they were the servants of someone else.

As we have discussed above, whether a servant of one employer has become the servant of another is a question of fact. *Gaston v. Sharpe,* 179 Tenn. at 614, 168 S.W.2d at 786. Ordinarily, that determination would be for the jury. However, in this case, the relationship between the two hospitals is governed by a written agreement. The interpretation of an unambiguous written agreement is a question of law for the court. *Merritt v. Nationwide Warehouse Co., Ltd.,* 605 S.W.2d 250, 255 (Tenn.Ct.App.1980).

The agreement between Vanderbilt and General provides that the residents, as members of the medical staff, were accountable solely to General; General had the right to approve the assignment of all medical staff personnel and all residents were to be supervised by and accountable to General.

■ The appellant argues that Tenn. Code Ann. § 29–20–107(c) (Supp.1988), a statute establishing the prerequisites for finding a person to be a governmental employee for purposes of immunity from tort liability, prevents the Vanderbilt doctors from being loaned servants of General. The statute provides:

No governmental entity may extend the immunity granted by this chapter to independent contractors or other persons or entities by contract, agreement or other means nor shall the doctrine of borrowed servants operate to make any person a governmental entity employee for the purpose of immunity who does not otherwise meet all of the elements set out in this section.

Tenn.Code Ann. § 29–20–107(c). We are of the opinion that the statute does not apply to the question involved here. It does not prevent the doctors from becoming the loaned servants of General; its purpose is to prevent the loaned servants from being immune from tort liability unless certain conditions are met.

In light of the undisputed terms of the written agreement, we hold that the Van-derbilt doctors were the loaned servants of General at the time of the operation on Mr. Parker. Therefore, any negligence on the part of the surgical team could not be imputed to Vanderbilt.

### 3. The Vanderbilt Doctors

■ There were four doctors present in the operating room on the night of Mr. Parker's operation. All four were receiving their surgical training through the Vanderbilt University residency program. Dr. Powell was the chief resident in surgery at General. He was in charge of and directed the surgical procedures involving Mr. Parker. Dr. Kreuger, the senior resident in surgery, performed the operation. Drs. Alexander and Peacock assisted the chief resident and the senior resident.

The student nurse, Ms. Murphy, conducted the insertion of the endotracheal tube. She was working under the supervision of Ms. Conner, a certified registered nurse anesthetist. Ms. Murphy was a registered nurse also and a student at Middle Tennessee School of Anesthesia. She had hospital privileges to administer anesthesia and was paid by General for her work. She had performed fifty-two intubations prior to the night in question.

Ms. Murphy and Ms. Conner were working under protocols developed by Dr. Alcantara, the chief of anesthesiology at General. The protocols authorized the anesthetist to administer anesthesia to surgical patients in Dr. Alcantara's absence. In part, the protocol provided:

A nurse anesthetist shall administer anesthesia to a patient in accordance with the general standard principles of anesthesiology to the best of his/her knowledge and belief, and along the guideline of the anesthesia services of the Department of Anesthesia, and as directed and/or advised by the anesthesiologist-in-charge, if any.

The attending physician/surgeon's preference in the way of anesthesia will be honored provided the preferred way of anesthesia is generally compatible with the guideline of the Department of

Anesthesia, and the general standard principles of anesthesiology. Otherwise, the nurse anesthetist will proceed with his/her own chosed [sic] way of anesthesia.

A nurse anesthetist will never be forced to administer anesthesia to a patient against his/her own will based upon a reasonable rationale except that, by the discretion of the attending physician/surgeon with full responsibility, the situation is such that an immediate surgical intervention with anesthesia is warranted regardless of the consequences,.... In case an anesthesiologist is not available for the above matter, the nurse anesthetist will either follow the attending physician/surgeon's decision or withdraw from the case by his/her own judgment with the exception of an emergency case....

A nurse anesthetist is a highly trained specialist acquiring skills in the course of his or her training that a surgeon does not possess. In this case, the nurse anesthetists were assigned by General Hospital according to a call schedule developed and implemented by the hospital. The surgeons did not select the drugs used to put the patient to sleep nor did they oversee or direct the procedures used by the nurse anesthetists.

Under these facts, the doctors argue that they cannot be held liable for the negligence of the nurse anesthetists because the nurse anesthetists are fellow servants and a surgeon employee is not liable for the negligence of other hospital employees. We have discussed this principle in the section of this opinion dealing with the liability of Dr. Alcantara where we cited the cases of *Gamble v. Vanderbilt University* and *Vance v. Hale.* The appellees also cite *Bass v. Barksdale,* 671 S.W.2d 476 (Tenn.Ct.App.1984), in which we said:

We find nothing in the record upon which to base vicarious liability. Both Dr. Quinn and Nurse Barksdale were employees of the Metropolitan Government. Dr. Quinn was Nurse Barksdale's supervisor but not her employer. Dr. Quinn was an immediate superior employee of Nurse Barksdale and is not liable for negligent acts of omission or commission committed by Nurse Barksdale. Dr. Quinn as an "intermediate superior employee[,] is to be held to respond only if his personal negligence, in an immediate act or command, was the efficient cause or a coefficient cause of the injury. He is not to be held along with the employer to constructive liability."

671 S.W.2d at 488 (brackets in original) (quoting *Brown & Sons Lumber Co. v. Sessler,* 128 Tenn. 665, 672, 163 S.W. 812, 813–814 (1914)).

None of these cases involve a surgeon and the negligence of nurses or other employees engaged in duties in the operating room. We are not disposed to extend the doctrine of these cases to the operating room and lay down a per se rule that a surgeon who is the employee of a hospital cannot be liable for the negligence of a nurse anesthetist who is also an employee of the hospital. We think that would carry the rule too far. A surgeon in the operating room is in a different position from a public employee supervising a construction crew (as in *Vance v. Hale*) or a doctor supervising the activities of a public health agency (as in *Bass v. Barksdale*).

If we are correct in the conclusions we have reached in regard to the application of the Captain of the Ship Doctrine, a surgeon is responsible for the negligence of third persons only when those persons are the servants of the surgeon and engaged in the surgeon's business. Under the facts of a particular case, a master and servant relationship may occur even though the surgeon is also employed by the same employer as the servant.

Under the general principles we have discussed, the question in this case is whether the surgeon exercised control over the means and method of the nurse anesthetists. This is a question of fact. If the essential facts are undisputed, however, and the movant shows that he is entitled to judgment as a matter of law, summary judgment is proper. Tenn.R.Civ.P. 56.

In this case, we are of the opinion that the undisputed facts in the record show

that the nurse anesthetists were not the servants of the doctors in the operating room. The doctors did not select the individuals involved in the administration of the anesthesia. They were selected in accordance with the policy of General Hospital. The drugs and procedures used by the nurse anesthetists were governed by hospital policy. The protocol under which the nurse anesthetist operated provided that the administration of anesthesia would be governed by standard principles of anesthesiology and the guidelines of the anesthesiology department of the hospital. Any direction by the surgeon would be honored only so long as it was compatible with the guidelines of the Department of Anesthesia. If the two conflicted, the nurse anesthetist must withdraw from the case (except in an emergency).

The plaintiffs rely on the testimony of Dr. Alcantara that in his absence the nurse anesthetist is under the direct control of the surgeon. This conclusion is confirmed by the protocol. Nurse Conner also testified that she considered herself under the direction of the doctors present at the surgery. Ms. Murphy stated that she believed that the doctors could control her actions. However, these statements refer to the general chain of command in the operating room—to the right to control the result, and not to the actual control over the means and method of administering the anesthesia. There is no testimony in this record that the surgeons in the operating room had power over the means and method of inserting the endotracheal tube.

Recent cases from other jurisdictions recognize the distinction we have drawn in this case. In *Fortson v. McNamara*, 508 So.2d 35 (Fla.1987), the court said:

> While we agree that a surgical nurse, under the direct supervision of the surgeon, who acts according to the surgeon's specific directions, is certainly the servant of the surgeon, we are not willing to place a nurse anesthetist in this category, particularly where there is no showing that the surgeon directed the procedures to be utilized by the nurse

anesthetist or had a genuine opportunity to alter the course of events.

*Id.* at 37.

In *Kemalyan v. Henderson*, 45 Wash.2d 693, 277 P.2d 372 (1954), the court held that a surgeon was not liable as the master of an anesthetist where the anesthetist "knew considerably more about administering an anesthetic than he did, and ... he left completely to her discretion the administration of the ether to the plaintiff." 277 P.2d at 375. *See also Thomas v. Raleigh General Hospital*, 358 S.E.2d 222 (W.Va.1987); *Hughes v. St. Paul Fire & Marine Ins. Co.*, 401 So.2d 448 (La.Ct.App.1981); *Sesselman v. Muhlenberg Hospital*, 124 N.J. Super. 285, 306 A.2d 474 (1973).

The plaintiffs cite other cases from other jurisdictions where a recovery has been allowed against the surgeon for the negligence of a nurse anesthetist or other persons assisting in the operating room. In *Jackson v. Joyner*, 236 N.C. 259, 72 S.E.2d 589 (1952), the Supreme Court of North Carolina held that a surgeon could be vicariously liable for the negligent administration of anesthesia by a nurse anesthetist because a surgeon was in charge of all the nurses present. In later cases, however, North Carolina courts have rejected the imposition of respondeat superior liability on a surgeon for the negligent acts of a nurse anesthetist. *See Starnes v. Charlotte–Mecklenburg Hospital Authority*, 28 N.C.App. 418, 221 S.E.2d 733 (1976); *Parks v. Perry*, 68 N.C.App. 202, 314 S.E.2d 287 (1984).

The plaintiffs also cite *McKinney v. Tromly*, 386 S.W.2d 564 (Tex.Civ.App.1965, writ ref'd n.r.e.), but the result in that case was specifically disapproved in *Sparger v. Worley Hospital, Inc.*, 547 S.W.2d at 585. We have cited the *Sparger* case above as authority for our conclusion that actual agency principles rather than the Captain of the Ship Doctrine govern the vicarious liability of a surgeon. Another case relied on by the plaintiffs, *Weinstein v. Prostkoff*, 23 Misc.2d 376, 191 N.Y.S.2d 310 (Sup. Ct.1959), *order rev'd*, 13 A.D.2d 539, 213 N.Y.S.2d 571 (1961), does not stand for the proposition that a surgeon is vicariously

liable for the negligence of a nurse anesthetist.

We conclude that the nurse anesthetists in this case were not servants of the surgeons.

### III. Personal Negligence

■ In order to hold a doctor liable for malpractice, the plaintiffs must show by competent expert testimony "(1) the standard of care, (2) that the defendant deviated from that standard, and (3) that as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred." *Dolan v. Cunningham,* 648 S.W.2d 652, 654 (Tenn.Ct.App.1982) (italics omitted); *see* Tenn.Code Ann. § 29–26–115 (1980).

■ Of the appellees, only the four doctors who were present in the operating room are alleged to have violated a duty of care to Mr. Parker. Although the complaint alleges a failure to recognize the problem, the issues raised on appeal indicate that their purported negligence consisted of a violation of their duty to supervise the nurse anesthetists. In support of their claim, the plaintiffs rely solely on the testimony of Dr. Alcantara. However, the record also includes two other affidavits which were filed in opposition to the motion for summary judgment in the court below; one affidavit is from a certified registered nurse anesthetist and the other is from an anesthesiologist.

Taken as a whole, the proof on file in opposition to the motion for summary judgment is to the effect that, in the absence of the anesthesiologist, the surgeon in charge (or some other physician present) is responsible for the nurse anesthetist. The term "responsibility" is used in the general sense. There is no testimony that the applicable standard of care requires a doctor present in the operating room to supervise the placement of an endotracheal tube. In fact, the affidavit of Dr. McAleavy, the expert anesthesiologist, says that the surgical team was not responsible for the misplacement of the tube up to the time of the collapse.

We conclude, therefore, that there is no evidence of the applicable standard of care of surgeons in supervising a nurse anesthetist.

The judgment of the court below is affirmed and the cause is remanded to the Circuit Court of Davidson County for any further necessary proceedings. Tax the costs on appeal to the appellants.

TODD, P.J., and LEWIS, J., concur.

### APPENDIX

### OPINION

KOCH, Judge.

The appellees have moved to dismiss this appeal on the ground that the appellant's notice of appeal was filed too late. They insist that the appellant's Tenn.R.Civ.P. 59 motion, filed after the entry of the summary judgment, was not timely and did not suspend the time within which Tenn.R. App.P. 4(a) requires a notice of appeal to be filed. We have determined that the appellant's Tenn.R.Civ.P. 59 motion was timely and, accordingly, that the appellant's notice of appeal was also timely.

### I.

Richard O. Parker was shot on June 17, 1984 while trying to escape from an armed robber. He was taken to Nashville Memorial Hospital where he suffered irreversible brain damage during surgery. On April 25, 1985, Kathryn Tyler, Parker's mother, filed an action on his behalf in the Circuit Court for Davidson County against Nashville Memorial Hospital, the Metropolitan Government of Nashville and Davidson County, Vanderbilt University, and eight other attending physicians and medical personnel.

The number of defendants began to dwindle as the case was readied for trial. On October 8, 1986, the trial court entered an order granting one physician's motion for summary judgment. On March 26, 1987, Mrs. Tyler filed a notice of voluntary dismissal of her action against another physician. On June 9, 1987, the trial court

entered another order granting Vanderbilt University's and four of its physicians' motion for summary judgment.

On July 8, 1987, Mrs. Tyler filed a notice of voluntary dismissal with regard to all the remaining defendants. The trial court entered an order confirming the nonsuit with regard to these defendants on July 29, 1987.

On July 30, 1987, Mrs. Tyler filed a "Motion for a New Trial" challenging the legal basis for the trial court's October 8, 1986 and June 9, 1987 orders granting summary judgments with regard to its claims against Vanderbilt University and five of the physician defendants. The trial court overruled the motion on August 13, 1987. Mrs. Tyler filed a notice of appeal on August 19, 1987 concerning the October, 1986 and June, 1987 summary judgment orders.

## II.

The timeliness of Mrs. Tyler's notice of appeal hinges upon the timeliness of her Tenn.R.Civ.P. 59 motion. If this motion was not timely, it could not suspend the running of the time within which Tenn.R.App.P. 4(a) requires a notice of appeal to be filed. *See* 6A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶¶ 59.-09[3] & 59.12[2] (2d ed. 1987); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2812, at 83–84 (1973).

The timeliness of Mrs. Tyler's Tenn.R.Civ.P. 59 motion, in turn, depends upon whether the June 9, 1987 order was a "judgment" for the purposes of Tenn.R.Civ.P. 59. There are no reported Tennessee decisions construing the meaning of the term "judgment" as it is used in Tenn.R.Civ.P. 59. However, because of the similarities between Tenn.R.Civ.P. 59 and Fed.R.Civ.P. 59, our decision can be guided by the decisions construing Fed.R.Civ.P. 59. *Bowman v. Henard,* 547 S.W.2d 527, 530 (Tenn.1977); *Marlowe v. First State Bank of Jacksboro,* 52 Tenn.App. 99, 105, 371 S.W.2d 826, 828–29 (1962).

Notwithstanding the title of the motion Mrs. Tyler filed on July 30, 1987, we deem it to be a Tenn.R.Civ.P. 59.04 motion to alter or amend the orders the trial court entered in October, 1986 and June, 1987.[1] Tenn.R.Civ.P. 59.04 requires that this motion "be filed within thirty (30) days after the entry of the judgment." The Vanderbilt defendants insist that the June 9, 1987 order was a "judgment" and that Mrs. Tyler's motion came too late because it was not filed within thirty days after the order was entered. We do not agree that the June 9, 1987 order was a judgment.

Tenn.R.Civ.P. 54.01 provides that a "[j]udgment as used in these rules includes a decree and any order from which an appeal lies." The order dismissing the Vanderbilt defendants as parties was not a "judgment" as defined by Tenn.R.Civ.P. 54.01 because it did not resolve all the claims between all the parties and, thus, was not appealable.[2] This order was merely an interlocutory adjudication that certain issues would be deemed established for the trial of the case. *See* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2715, at 627 & 631 (1983); 11 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2737, at 463–64 (1983); Advisory Committee Report on Proposed Amendments to Federal Rules of Civil Procedure, 5 F.R. 433, 474–75 (1946).

Mrs. Tyler was under no obligation to file her Tenn.R.Civ.P. 59 motion until the June 9, 1987 order became final. This did not occur until July 8, 1987 when she filed her Tenn.R.Civ.P. 41.01 notice voluntarily dismissing her action against the remaining

---

1. Obviously, there had been no trial in this case at the time the motion was filed. Thus, calling the motion a "motion for a new trial" was a mistake. However, this error is of no consequence because the courts look to the substance of a motion, not its title. *Bemis Co. v. Hines,* 585 S.W.2d 574, 576 (Tenn.1979); *Pickard v. Ferrell,* 45 Tenn.App. 460, 471, 325 S.W.2d 288, 292–93 (1959).

2. *See Stidham v. Fickle Heirs,* 643 S.W.2d 324, 328 (Tenn.1982); Tenn.R.App.P. 3(a). A party has an appeal as of right only when all the claims between all the parties have been adjudicated or when a partial disposition has been made final pursuant to Tenn.R.Civ.P. 54.02. The Vanderbilt defendants concede in their motion to dismiss this appeal that the June 9, 1987 order does not fit within either category.

defendants.[3]  Mrs. Tyler's Tenn.R.Civ.P. 59 motion was timely because it was filed within thirty days after the filing of her Tenn.R.Civ.P. 41.01 notice.  Accordingly, it had the effect of postponing the commencement of the time within which she was required to file her notice of appeal until the trial court ruled upon the motion.  The trial court denied the motion on August 13, 1987.  Thus, her notice of appeal was timely because it was filed within thirty days after the Tenn.R.Civ.P. 59 motion was denied.

3.  It is the date of the filing of the written notice of voluntary dismissal, not the entry of the confirmatory order, that triggers the commencement of the time within which a Tenn.R.Civ.P. 59 motion or notice of appeal must be filed.

### III.

For the reasons stated herein, the motion to dismiss this appeal is denied.

TODD, P.J., and LEWIS, J., concur.

*See Rickets v. Sexton,* 533 S.W.2d 293, 294 (Tenn.1976).