IN THE COURT OF APPEALS
AT KNOXVILLE

FILED

November 17, 1998

Cecil Crowson, Jr.
Appellate Court
Clerk

ESTATE OF SHIRLEY J. DANNENHOLD, KNOX COUNTY
by her Executrix, MARGARET            )      03A01-9710-CV-00443
HENSLEY                               )
                                      )
        Plaintiff-Appellant           )
                                      )
        v.                            )      HON. WHEELER ROSENBALM,
                                      )      JUDGE
KNOXVILLE PATHOLOGY GROUP, P.C.,      )
CARTER MILLER, JR., M.D. and          )
BRUCE BELLOMY, M.D.                   )
                                      )      AFFIRMED IN PART; VACATED
        Defendants-Appellees          )      IN PART and REMANDED

DONNA KEENE HOLT OF KNOXVILLE FOR APPELLANT

EDWARD G. WHITE, II, and AMY V. HOLLARS OF KNOXVILLE FOR APPELLEES

O P I N I O N

Goddard, P.J.

        In this cause Shirley J. Dannenhold[1] sues Knoxville Pathology Group, Carter

Miller, Jr., M.D., and Bruce Bellomy,

---

[1]     Ms. Dannenhold died after suit was filed and a substitute
complaint was filed by her Executrix.

M. D., for medical malpractice incident to the misreading of a 1993 pap smear by Louise Geldmeier, who inaccurately issued a negative report rather than a positive one.[2]

The complaint as to the Defendants in this appeal was predicated upon two theories. First, the doctrine of loaned servant, it being the contention of the Plaintiff that Ms. Geldmeier, although employed by Fort Sanders, was loaned to the Defendants. The second was the independent negligence of the Defendants in failing to adequately train and supervise those interpreting the specimens submitted for examination.

The Trial Judge's grant of summary judgment was predicated upon his determination "that the record fails to demonstrate a genuine issue of material fact regarding a deviation from recognized standards of acceptable professional practice on the part of the moving Defendants or a genuine issue of material fact regarding causation of an injury that would not have otherwise occurred as a result of the actions of the moving Defendants." The Plaintiff filed a motion to alter and amend, specifically calling to the Trial Court's attention it's loaned servant theory. The Trial Court denied this motion without comment as to that theory.

As already noted, the Trial Court sustained the Defendants' motion for summary judgment, resulting in this appeal wherein three issues are raised:

> I.     Would it be a denial of due process if the trial court refused to apply the recognized standard of review for a motion for summary judgment in an even-handed manner.
>
> II.  Were there disputed issues of fact presented as to the defendants' responsibility for the negligence of an agent and the independent negligence of these defendants.
>
> > A.     Was the cytotechnologist who misread the pap smear slide submitted on Shirley Dannenhold the agent and/or borrowed servant

---

[2]     The original complaint also included as Defendants Ms. Geldmeier and Fort Sanders Regional Medical Center, Inc.  A non-suit was taken as to Ms. Geldmeier and the claim against Fort Sanders was settled.

2

of Defendant Carter Miller, the pathologist who issued the negative report as his diagnosis when it is undisputed that the report of pap smear results is a medical opinion that must be issued by the pathologist, and further evidence demonstrates that the cytotechnologist was engaged in the business of and was under the supervision of the pathologist at the time she performed the pre-screen reading of the slide.

B.    Was there a genuine issue of material fact presented as to the independent negligence of the defendants when plaintiff presented affidavits from a qualified pathologist that disputed the defendants' interpretation of their duty in the operation of this laboratory and particularized several specific deviations from the standards of acceptable professional practice by the defendants.

III. Was there a genuine issue of material fact presented as to whether the negligence of the defendants caused injury to Shirley Dannenhold when plaintiff offered expert testimony as to how the specific deviations from the standards of acceptable practice caused the erroneous report to be issued without a pathologists's review, and it is undisputed that if a pathologist had reviewed the slide the cancer would have been reported, and it is further undisputed that the delay in diagnosis caused a highly curable, noninvasive cancer to progress to an invasive, terminal cancer that has since claimed the life of Shirley Dannenhold.

The first issue is dependent upon a motion in this Court to supplement the record with proceedings in another case. A motion to make the material a part of the record on appeal was denied by the Trial Court. The motion was predicated upon an unrelated case that the Plaintiff perceives to be an inconsistent ruling by the same trial judge as in this case, which favored the defendants in a summary judgment motion by the plaintiffs, as distinguished from granting the Defendants' motion in this case.

In light of our disposition of the first point under issue two and our independent review of the remaining issues, we also deny the motion.

Our standard for review of summary judgment is set out in Byrd v. Hall, 847 S.W.2d 208, 214 (Tenn.1993), the leading case by the Supreme Court on the subject:

Rule 56 comes into play only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

3

Thus, the issues that lie at the heart of evaluating a summary judgment motion are: (1) whether a *factual* dispute exists; (2) whether the disputed fact is *material* to the outcome of the case; and (3) whether the disputed fact creates a *genuine* issue for trial.

The foregoing authority mandates that notwithstanding the contrary proof placed in the record by the Defendants, we adopt as the facts necessary for disposition of this appeal the facts contained in the record and set out in the Plaintiff's brief, which we have checked for accuracy. We have, however, edited the Plaintiff's statements of the facts slightly, to delete assertions of undisputed proof as to various facts, and to delete reference to hearsay testimony of Dr. Gary Cooper, which we do not believe would be admissible as to a substantive issue at trial.[3] Footnotes in the portion of the brief we quote are included in this text:

Knoxville Pathology Group, P.C. has an exclusive contract with Fort Sanders Regional Medical Center (hereinafter referred to as "Hospital") to provide management services and physician coverage for the pathology and laboratory departments of the hospital. At all times material to this action, Dr. Bruce Bellomy served as the medical director of the hospital's on-site laboratory. The cytology department is the department of the laboratory that processes pap smears submitted to the hospital laboratory for examination and diagnosis.

There were three cytotechnologists employed in the cytology department and the pathologists who were members of Knoxville Pathology Group, P.C. rotated on a daily basis the duty of the technical supervisor for cytology, which is the management position that directly supervised the cytotechnologists, and this pathologist would also render the opinions on the diagnostic results of all pap smear specimens submitted for examination that day. The cytotechnologists were paid employees of the Hospital, but a large portion of their time was spent each day performing pre-screen readings on slides, the reports for which would be issued by members of the Knoxville Pathology Group, P.C. as their diagnostic opinions for the slides submitted.

In 1991 and in 1993 pap smear slides on Shirley Dannenhold were submitted by her gynecologist to the defendants for interpretation in connection with her routine physical examinations. On both occasions the slides were reported as negative for any cancer cells. Subsequent review of these slides demonstrated that both slides in fact did show adenocarcinoma in-situ that should have been detected and reported.

---

[3] Dr. Cooper was not a member of the pathology group when the readings were made in 1991 and 1993. He did, however, examine the slides in 1994 after a question as to their accuracy was raised.

Mrs. Dannenhold sought treatment from a different physician in early 1994 and her pap smear sample was submitted to a different laboratory, and her cancer diagnosis was reported in January 1994. Treatment ensued, but at the time of diagnosis the cancer had already become invasive. In May of 1994 Mrs. Dannenhold saw a segment on the television news show "Primetime" that reported laboratory practices that had caused positive pap smears to be reported as negative. She contacted her former gynecologist and asked whether her previous slides could be reviewed and her physician made the request to defendants that this be done. At the time of this request Dr. Gary Cooper had joined the defendant pathology group and after he pulled Mrs. Dannenhold's slides from 1991 and 1993 he issued a supplemental report of the amended diagnosis to the effect that both the 1991 and 1993 slides were positive for adenocarcinoma in-situ of the cervix.

The pathologists who issued the 1991 and 1993 reports did not actually view either of the slides, but on both occasions issued the negative diagnosis by relying on the pre-screen reading given the slides by a cytotechnologist.[4] The diagnosis of the pap smear is issued only in the name of the pathologist and the patient is charged the same for the pap smear diagnosis, regardless of whether the slide was actually read by the pathologist or reported based only on the pre-screen reading given by the cytotechnologist. The cytotechnologists should have recognized the slides to be abnormal in 1991 and in 1993 and should have identified them for further review by the supervising pathologist who would be issuing the reports for that day. If Louise Geldmeier had simply noted the presence of "reactive change" on the slide, the slide should have been designated for review by a pathologist. If a pathologist had read the slides on either occasion, the diagnosis should have been made and reported to Mrs. Dannenhold's gynecologist. If the diagnosis had been made even as late as 1993, while the cancer was still a stage 1 adenocarcinoma of the cervix, Mrs. Dannenhold would have expected a cure rate of 85-90 percent. The delay in diagnosis that resulted from the erroneous pap smear report of 1993 caused Mrs. Dannenhold's highly curable cancer to progress to an invasive and terminal cancer that was expected to claim her life.[5]

---

[4]      The 3-year repose provision of Tenn.Code Ann. § 29-26-116(a) had already passed on the 1991 slide before Mrs. Dannenhold learned that she had cancer, which ultimately led to her discovery of the defendants' negligence in reporting her previous pap smears as negative. The cytotechnologist who read the 1991 slide and the pathologist who issued the negative report on the 1991 slides were not named as defendants to this action, and no attempt has been made by the plaintiff to assert a claim for recovery of damages for the negligence that took place in 1991. The events of 1991 are still relevant evidence, however, in connection with plaintiff's allegations regarding the independent negligence of the defendants in the operation and management of this laboratory, and the failure to identify and remedy an obvious deficiency in the proficiency of the technicians to whom these defendants ere delegating the task of reading slides.

[5]      Mrs. Dannenhold did in fact die in August of 1997, and her substituted complaint has been filed to allow her Executrix to proceed with this action.

As to the issue of loaned servant presented in the first part of issue two, we find that of all the cases cited by the parties, the case of Parker v. Vanderbilt University, 767 S.W.2d 412, 416 (Tenn.App.1988), is the case more nearly in point factually to the case at bar. In that case, at the time of the alleged negligence, the surgical staff at Nashville General Hospital "was furnished by Vanderbilt University under a contract with Metropolitan Government of Nashville and Davidson County." Our Court specifically addressed the loaned servant question as follows:

An employee of one employer may become the servant of another and shift the liability for his negligent acts to the second employer. *See Richardson v. Russom Crane Rental Co.*, 543 S.W.2d 590 (Tenn.Ct.App.1975). The test to determine whether an employee is a loaned servant of another employer has been set out in *Gaston v. Sharpe*, 179 Tenn. 609, 168 S.W.2d 784 (1943). In *Gaston*, the court said:

[A] servant at a particular time may remain under the control of his general employer for some purposes and yet be under the control of a special employer for others. Likewise it sometimes happens that a particular work in which the servant is engaged may be properly considered as the work or business of both the general employer and the special employer.

The question is difficult. It is considered at some length in Restatement of Agency, § 227. We take the following from Restatement as a satisfactory rule: "Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, the direction of one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case."

179 Tenn. at 614, 168 S.W.2d at 786.

In that case the Court concluded that, although the question whether a servant of one employer has become the servant of another is generally a question of fact for the jury, the unambiguous agreement between the parties made it a question of law, and thereafter opined as follows (at page 417):

The agreement between Vanderbilt and General provides that the residents, as members of the medical staff, were accountable solely to General; General had the right to approve the assignment of all medical staff personnel and all residents were to be supervised by and accountable to General.

. . . .

In light of the undisputed terms of the written agreement, we hold that the Vanderbilt doctors were the loaned servants of General at the time of the operation on Mr. Parker. Therefore, any negligence on the part of the surgical team could not be imputed to Vanderbilt.

In the case at bar the contract between Fort Sanders and the Radiology Group contained no such specific language.

We also note that the Defendants were the ones that provided the instructions to those testing the pap smears as to how they were to be prepared and were to be read.

We conclude in light of the fact that the contract between Fort Sanders and Knoxville Radiology Group did not contain the unambiguous provisions as were present in Parker, this case is distinguishable and a question of fact is presented as to whether Ms. Geldmeier was a servant loaned by Fort Sanders to the Defendants.

Finally as to this question, we point out that under certain circumstances an employee may be the servant of a general employer and also a special employer. Parker, supra.

As to the second part of the second issue, it is undisputed that the Defendants complied with the Federal Clinical Laboratory Improvement Act, which the Plaintiff's expert testified was merely a codification of prior law, and although this expert also testified as to a deviation from accepted practice regarding review by a pathologist, he was predicating his testimony on an inference he drew from a fact he assumed (cytotechnologist's markings made by

7

the cytotechnologist when the 1993 slide was examined), which the record shows without dispute was not true.

As to the second sub-section of issue two, the proof shows that under regulations promulgated under the CLIA, the Defendants had a duty to adequately supervise the cytotechnologists, and to this end the regulations require that a pathologist review a random selection of ten percent of all slides found by the technicians to be negative. The undisputed proof supports the Defendants' contention that this requirement was honored.

The Plaintiff's expert also found fault with the method used by the Defendants in selecting those negative slides which were to be reviewed by the pathologist. The proof showed that those that had some indication of abnormality were used in the 10 percent selected rather than those that unquestionably appeared negative. The expert apparently reasons that Mrs. Dannenhold's pap smear would have been drawn had the method he suggested been employed. We find that such a conclusion would be pure speculation and that the Trial Court was correct in sustaining the Defendants' motion for summary judgment as to this point.

The third issue attacks the finding of the Court that there is no "genuine issue of material fact regarding causation of an injury that would not have otherwise occurred as a result of the actions of the moving Defendants." The testimony of Dr. Matthew Kohler, one of the Plaintiff's expert witnesses, establishes that had a proper diagnosis been made as to the 1993 pap smear, Mrs. Dannenhold had an excellent chance of recovery and that her cure rate was in the range of 85 to 90 percent.

For the foregoing reasons the judgment of the Trial Court is vacated insofar as it addresses the loaned servant theory and remanded to the Trial Court for further proceedings not inconsistent with this opinion. The judgment of the Trial Court is affirmed as to other theories

advanced. Costs of appeal are adjudged one-half against the Plaintiff and one-half against the Defendants.

_____
Houston M. Goddard, P.J.

CONCUR:


_____
Herschel P. Franks, J.


_____
Don T. McMurray, J.