IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 9, 2017 Session

FILED
06/29/2018
Clerk of the
Appellate Courts

## BONNIE HARMON, ET AL. v. HICKMAN COMMUNITY HEALTHCARE SERVICES, INC.

**Appeal from the Circuit Court for Hickman County**
**No. 14-CV-6        Deanna B. Johnson, Judge**

_____

### No. M2016-02374-COA-R3-CV

_____

This suit was brought by the children of a woman who died while incarcerated at Hickman County Jail. Defendant is a contractor of the jail that provides medical services at the jail; a nurse in Defendant's employment treated the decedent for symptoms of drug and alcohol withdrawal. She passed away shortly after. The children brought this suit under the Health Care Liability Act claiming negligence and negligent hiring, retention, and supervision. In due course, Defendant moved for summary judgment, arguing, among other things, that there was not a genuine issue of material fact as to causation and it was entitled to judgment as a matter of law on that element of Plaintiffs' claim; the trial court granted Defendant's motion and subsequently denied a motion to revise, filed by the Plaintiffs. This appeal followed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part and Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., joined. W. NEAL MCBRAYER, J., filed a dissenting opinion.

David Randolph Smith, Dominick R. Smith, W. Lyon Chadwick, Jr., and Christopher W. Smith, Nashville, Tennessee, for the appellants, Bonnie Harmon, Jenny Fagan, and Edward Fagan.

C. Bennett Harrison, Jr., and Brian W. Holmes, Nashville, Tennessee, for the appellee, Hickman Community Healthcare Services, Inc. d/b/a Hickman County Hospital.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

On December 12, 2011, after being found in possession of drugs and drug paraphernalia during a traffic stop, Pamela Rudder was arrested and incarcerated in the Hickman County Jail. At some point, she started experiencing symptoms of narcotic withdrawals, and on December 15 at 6:33 a.m., Ms. Rudder made a "grievance report" through the jail's system, in which she stated that she was "going through bad withdrawals" and requested that she be seen "as soon as possible." She was treated in the jail's medical unit by Tonie D. Cloud, R.N. ("Nurse Cloud"), an employee of Hickman Community Healthcare Services, Inc., ("Hickman County Healthcare" or "Defendant") assigned to the Hickman County jail.[1] Ms. Rudder was later found unresponsive in her cell, and she passed away December 16, 2011.

Bonnie Harmon, Jenny Fagan, Edward Fagan, and Matthew Bilbery,[2] the surviving children of Ms. Rudder, sued Saint Thomas Health, Ascension Health, Millennium Medical Trust, Inc., and Hickman County Healthcare in Davidson County Circuit Court on April 11, 2013, asserting that the defendants were liable for Nurse Cloud's negligence and for the negligent hiring, training, and supervision of Nurse Cloud. Plaintiffs amended their complaint to add a factual allegation relative to their claim that Ascension Health's corporate veil should be pierced. Saint Thomas Health, Ascension Health, and Millennium Medical Trust, Inc., later moved for and were granted summary judgment on the basis that they were not proper parties. Following their dismissal, the case was transferred to Hickman County Circuit Court under Tennessee Code Annotated section 16-1-116.

After the case was transferred, Defendant moved for summary judgment ("First Motion for Summary Judgment"), arguing that the treatment that Nurse Cloud provided Ms. Rudder complied with the applicable standard of care, that Defendant was not negligent in any manner, and because Plaintiffs had executed a settlement agreement with Hickman County in another action arising out of Ms. Rudder's death, which Defendants alleged also included Plaintiffs' claims against Defendant; in the memorandum accompanying the motion, Defendant also argued that it could not be held liable for Nurse Cloud's actions under the loaned servant doctrine. The trial court denied the motion on October 28, ruling that there were genuine issues of material fact which precluded summary judgment.

---

[1] Hickman County Healthcare had a contract with Hickman County to provide medical services to the Hickman County Jail.

[2] On September 18, 2015, Mr. Bilbery was dismissed, as not being a proper party to the suit.

After securing the deposition of Dawn Glenn, a nurse practitioner employed by Defendant who also worked at Hickman County Jail, and the affidavit of Robin Crowell, Defendant's Chief Nursing Officer, Defendant filed a Renewed and Supplemental Motion for Summary Judgment (the "Renewed Motion") on September 11, 2015. In the motion, Defendant argued it was entitled to judgment as a matter of law (1) on its loaned servant defense and (2) because the affidavit of Donna Seger, M.D., its expert witness, and Ms. Rudder's autopsy report negated the element of causation.

On September 15, 2015, Plaintiffs filed two motions: a motion for partial summary judgment on the issues of standard of care and causation (the "Causation Motion"), supported by a Tennessee Rule of Civil Procedure 56.03 statement of undisputed material facts, and the affidavits of Nurse Cindy Kovacs-Whaley and their medical expert, Martin H. Wagner, M.D. In response to the motion, Defendants argued, *inter alia*, that Dr. Wagner did not meet the criteria at Tennessee Code Annotated section 29-26-115(b) in that he did not "practice a profession or specialty which would make [his] expert testimony relevant to the issues in the case." Plaintiffs also moved for partial summary judgment on the loaned servant doctrine ("Loaned Servant Defense Motion"), seeking dismissal of that affirmative defense. On October 8, Plaintiffs moved to amend their Second Amended Complaint ("October 8 Motion to Amend");[3] they sought to add a claim of negligent training and supervision "in response to [Defendant]'s affirmative defense based on the loaned servant doctrine, and newly discovered evidence obtained in discovery." Defendant's Renewed Motion and Plaintiffs' Causation Motion, Loaned Servant Defense Motion, and October 8 Motion to Amend were heard and taken under advisement on November 2, 2015.

On January 8, 2016, the trial court entered an order granting the October 8 Motion to Amend;[4] the court denied the Causation Motion on January 21, and the Loaned

---

[3] The parties and the trial court made repeated reference to a Second Amended Complaint that was purportedly filed on May 1, 2014, and continue to make reference this Second Amended Complaint on appeal; there is no such document in the record on appeal. An unstampfiled "Second Amended Complaint" is included as Exhibit B to Defendant's brief on appeal. On December 19, 2014, Defendant answered Plaintiffs' Second Amended Complaint, which is in the record. We consider the Exhibit B Second Amended Complaint as the operative complaint for purposes of this appeal.

[4] These motions were heard and taken under advisement on November 2, 2015. On January 8, 2016, the trial court entered a Memorandum and Order, granting Plaintiffs' October 8 Motion to Amend and setting forth its rationale. The certificate of service on the Memorandum and Order, however, was not completed and the record does not show that the signed order was sent to counsel for the parties. The Notice of Appeal was filed on November 9, 2016 and, in the course of reviewing the record for purposes of appeal, counsel for Plaintiffs discovered the Order entered January 8, 2016. Counsel thereupon filed the Third Amended Complaint in the trial court on April 27, along with a motion to supplement the record. Following a hearing, the motion was denied on the May 11, 2017, the court holding that "pursuant to Tenn. R. Civ. P. 24(g) the Third Amended Complaint is not necessary to provide the Court of Appeals a fair, accurate or complete account of what occurred in the trial court with regard to the grant of Defendant's Renewed and Supplemental Motion for Summary Judgment" because "the Third Amended

3

Servant Defense Motion on January 25. On April 4, the court ruled on the Renewed Motion (the "April 4 Order"), denying the motion as to Defendant's loaned servant defense, and granting Defendant summary judgment on causation; the court held that Dr. Wagner's declaration "fails to reveal that he is competent under Tennessee Code Annotated § 29-26-115(b) and his declaration should be excluded from the record," and that, consequently, there was not a genuine issue of material fact on causation.

On May 4, Plaintiffs filed a Motion to Revise the April 4 Order based on newly submitted declarations of an expert physician, Dr. Kris Sperry; a hearing was held, and by order entered July 19, the court denied the motion. On November 2, 2016, the trial court entered an order certifying the April 4 Order as final.

The parties each raise multiple issues on appeal, generally addressing whether the trial court erred by granting Defendant's Renewed Motion, denying Plaintiffs' Motion to Revise, denying the parties' summary judgment motions on the loaned servant doctrine, or granting Plaintiffs' October 8 Motion to Amend. We begin our analysis with the Motion to Revise.

## II.    MOTION TO REVISE

While Plaintiffs' stated ground for the Motion to Revise was Tennessee Rule of Civil Procedure 54, in an order entered April 5, 2017, this court noted that the motion sought relief consistent with Rule 59, and treated it as such; we continue our analysis in that regard.[5]

A Rule 59 motion "allows the trial court to correct any errors as to the law or facts that may have arisen as a result of the court overlooking or failing to consider matters." *Chadwell v. Knox County,* 980 S.W.2d 378, 383 (Tenn. Ct. App. 1998).

> These motions "may be granted (1) when the controlling law changes before a judgment becomes final, (2) when previously unavailable evidence becomes available, or (3) when, for sui generis reasons, a judgment should

Complaint had not been filed with the Court, the trial court could not have properly considered it when granting Defendant's Renewed and Supplemental Motion for Summary Judgment." The trial court based its decision on the allegations of the Second Amended Complaint. While neither party complains on appeal that the court should not have based its decision on the Second Amended Complaint, Defendant argues that the October 8 motion should not have been granted; the Plaintiffs have responded. We resolve Defendant's argument *infra*.

[5] The April 5, 2017, order was entered on Defendant's motion to dismiss the appeal for not being timely filed. In the order, we noted the procedural history of the case; Plaintiffs had filed a "Tenn. R. Civ. P. 54.02 Motion to Revise" within 30 days of the April 4 Order, a "Premature Notice of Appeal" and a Tennessee Rule of Appellate Procedure 9 application for permission to appeal on August 18, 2016. We denied the Rule 9 application on September 23, 2016.

4

be amended to correct a clear error of law or to prevent injustice. They should not, however, be granted if they are simply seeking to relitigate matters that have already been adjudicated." *Bradley v. McLeod,* 984 S.W.2d 929, 933 (Tenn. Ct. App. 1998).

*Vacarella v. Vacarella*, 49 S.W.3d 307, 312 (Tenn. Ct. App. 2001). Additionally, when the basis for the motion is to alter or amend an order granting summary judgment based on newly submitted evidence, the trial court should consider the following factors:

> [1] [T]he moving party's effort to obtain the evidence in responding to the summary judgment; [2] the importance of the new evidence to the moving party's case; [3] the moving party's explanation for failing to offer the evidence in responding to the summary judgment; [4] the unfair prejudice to the non-moving party; and any other relevant consideration.

*Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003) (citing *Harris v. Chern*, 33 S.W.3d 741, 745 (Tenn. 2000) ("When additional evidence is offered by a litigant to overcome a grant of summary judgment pursuant to Rule 54.02, trial courts must undertake the above-stated balancing analysis and should make adequate findings of fact and conclusions of law on the record to support their rulings.")) (footnote omitted).

Plaintiffs moved the court to revise the April 4 Order based on previously unavailable evidence, specifically the declarations of Dr. Sperry, an expert in pathology; the motion was also supported by the affidavit of Plaintiffs' counsel, Mr. Smith.

In the order entered July 19, the trial court made Findings of Fact:

> Plaintiffs were on notice that Dr. Wagner's competency was being challenged yet chose to take the risk of relying solely on his testimony. The Affidavit of Plaintiffs' counsel filed in support of the Motion to Revise reflects that, as early as October 12, 2015, he was on notice that Defendant was going to challenge Dr. Wagner's competency. (Smith Aff. ¶ 3). In addition, on October 27, 2015, Plaintiffs were served with Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment on the issue of causation, which called into question Dr. Wagner's credentials. The matter was then argued at length on November 2, 2015, and taken under advisement by the Court for five months before the Court published a 56 page Order on April 4, 2016.

> Plaintiffs had been in communication with Kris Sperry, M.D. (hereinafter "Dr Sperry") for over two years prior to the Motions for Summary Judgment being filed, and remained in contact with him afterward. The Affidavit of Plaintiffs' counsel reflects that Dr. Sperry had been retained or

5

consulted by Plaintiffs and a conversation was held concerning Dr. Sperry's medical opinion of the case in June, 2013. (Smith Aff. ¶ 4, Ex. 2). The Affidavit reflects that Plaintiffs' counsel contacted Dr. Sperry via email on October 16, and 20, 2015, but they did not hear back from Dr. Sperry. Plaintiffs' Affidavit further reflects that Plaintiffs received a voicemail from Dr. Sperry on December 1, 2015, informing Plaintiffs that Dr. Sperry had suffered a ruptured disc in his back, which was why he had not been communicating. (Smith Aff. ¶ 4, Ex. 2). Plaintiffs did not seek any relief under Rule 56.07 of the Tennessee Rules of Civil Procedure for an extension of time to obtain additional affidavits. Following the Court's April 4, 2016, Memorandum and Order, Plaintiffs obtained Dr. Sperry's Declaration on May 2, 2016, and submitted it to the Court along with its May 4, 2016, Motion to Revise. Plaintiffs did not request a continuance of the November 2, 2015, Hearing on the Motions for Summary Judgment in order to obtain Dr. Sperry's Declaration, Affidavit, or Deposition.

Based on these findings the trial court made the following conclusions of law:

As for the first factor to be considered — the movant's efforts to obtain evidence to respond to the motion for summary judgment - Plaintiffs did not make a strong effort to obtain Dr. Sperry's declaration, despite being put on notice that Defendant was challenging Dr. Wagner's competency. Plaintiffs sent two emails to Dr. Sperry on October 16, and 20, 2015, even though Plaintiffs had originally consulted Dr. Sperry in June of 2013. Plaintiffs did not hear back from Dr. Sperry before the Hearing on the Motions for Summary Judgment. Although Plaintiffs knew they needed Dr. Sperry's testimony, they failed to ask the Court to continue the Motions for Summary Judgment Hearing that was scheduled for November 2, 2015. Instead, Plaintiffs took a gamble and moved forward with the Hearing. Moreover, Plaintiffs had ample time to file for an extension of time to obtain Dr. Sperry's Declaration after the Hearing while the Motion for Summary Judgment was under advisement.

The second factor to be considered is the importance of the newly submitted evidence to the movant's case. Here, the importance of the newly submitted evidence to Plaintiffs' case is high, and Plaintiffs were aware of its importance. Plaintiffs could have submitted the Declaration of Dr. Sperry, along with a contemporaneous Motion to Supplement Plaintiffs' Response to Defendant's Motion for Summary Judgment prior to the Court's ruling, which was not entered for more than five months after the Court took it under advisement. Instead, Plaintiffs chose to await the Court's decision in hopes for a favorable ruling.

6

The third factor to be considered is the explanation offered by the movant for its failure to offer the newly submitted evidence in its initial response to the motion for summary judgment. Here, Plaintiffs offer two explanations for why Dr. Sperry's Declaration was not submitted. First, Plaintiffs argue Dr. Sperry was unreachable due to the slipped disk in his back. However, as stated above, Plaintiffs were free to seek relief for a continuance of the November 2, 2015, Hearing or an extension of time to obtain additional affidavits or obtain the declaration and file a motion to supplement. Moreover, Plaintiffs had established contact with Dr. Sperry as early as 2013, and communicated with him as late as December 2015, yet chose not to obtain his Declaration nor file for an extension of time to do so.

In addition, Plaintiffs argued at the May 26, 2016, Hearing on the Motion to Revise that Plaintiffs did not believe Dr. Sperry's Declaration was necessary to survive the summary judgment stage, and instead took a calculated risk by relying solely on Dr. Wagner. The Court has previously emphasized in this lawsuit its conviction that the summary judgment stage must be taken seriously. The Court finds that Plaintiffs' choice to rely solely on Dr. Wagner's competency was one that carried great importance, and one that Plaintiffs' counsel made consciously with the full awareness of the potential consequences. Accordingly, Plaintiffs are responsible for the outcome of that decision.

The fourth factor is the likelihood that the nonmoving party will suffer unfair prejudice. The Court finds it would be unfairly prejudicial to Defendant to grant Plaintiffs' Motion after Plaintiffs had numerous chances to submit Dr. Sperry's testimony or ask for an extension of time during the Summary Judgment phase.

A trial court's ruling on a motion to alter or amend will be reversed only for an abuse of discretion. *Harris*, 33 S.W.3d at 746. An abuse of discretion occurs if a trial court causes an injustice to a party by "(1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). We resolve this issue using the factors set forth in *Stovall*.

A.    **Plaintiffs' effort to obtain Dr. Sperry's declaration and explanation for not offering it earlier**[6]

---

[6] Because *Stovall* factors (1) and (3) involved overlapping facts and mandate the same analysis in this appeal, we will discuss them together.

7

In support of the motion to revise, Plaintiffs' counsel, Mr. Smith, filed an affidavit to "explain why an affidavit from Dr. Kris Sperry could not be obtained—through the exercise of due diligence—before the November 2, 2015 hearing on defendant's renewed and supplemental motion for summary judgment." Mr. Smith explained in his affidavit that he was first notified that Defendant was challenging Dr. Wagner's competency on October 12, 2015, when Defendant's counsel notified him by email. Mr. Smith stated that once he knew that Dr. Wagner's competence was being challenged, he emailed Dr. Sperry on October 16, asking him to draft a declaration concerning Ms. Rudder's cause of death, and after failing to receive a response, he followed up with Dr. Sperry by email on October 20.[7] Mr. Smith further explained that he did not receive any communication from Dr. Sperry until December 1, 2015, at which time Dr. Sperry left Mr. Smith a voicemail in which Dr. Sperry explained why he had not responded earlier, that he had sustained a back injury that kept him from working.[8] The statements in Mr. Smith's affidavit were consistent with his statements at the November 2 hearing on the pending motions, wherein he informed the court and defense counsel that he would seek to offer new evidence from another expert if the trial court were inclined to grant the motion:

> So just assuming for a second that [Defendant's] argument is well taken, we would request the opportunity to get another expert that could address her points. But we don't believe that's necessary, because [Defendant] cannot meet [Defendant's] burden of production under Rule 56, because [Defendant] can't show that [Dr. Seger] was practicing during the year preceding the negligent act.

Mr. Smith explained in the hearing on the motion to revise that, despite having consulted with Dr. Sperry as early as December of 2013, Plaintiffs chose not to request an affidavit from him at that time, in part due to the high cost of pathologist testimony, and that Plaintiffs had the declaration of Dr. Wagner, whom they considered competent to testify as to causation.

---

[7] These emails were attached to Plaintiffs' Motion to Revise. In the October 16 email Mr. Smith asked Dr. Sperry if he was "available before 10/26 (our response date) to discuss submitting a declaration in order to respond to Dr. Seger's affidavit?" He reiterated his request in the October 20 email.

[8] Dr. Sperry's voicemail was played via CD-ROM during the hearing on Plaintiffs' Motion to Revise and was transcribed by the court reporter:

> "Hey, Mr. Smith. This is Dr. Sperry down in Atlanta. I'm sorry it took me so long to get back to you. I had a ruptured disc in my back that just really kind of put me out of action for a bit. Anyway, this is about the Rudder matter. You know, I'm -- you know, I can still help you with that. My number, if you want to give me a call, is []. Otherwise, you have my email, which is []. And I look forward to working with you again. Thanks. Bye, bye."

The evidence presented in support of the motion shows that when Plaintiffs recognized that there might be a need for additional expert proof to meet their burden of production at the summary judgment stage,[9] they attempted to secure such testimony from Dr. Sperry, an expert with whom they had previously consulted. The Plaintiffs then put the trial court and Defendant on notice that they wanted an opportunity to offer such additional expert proof in the event the trial court found that Dr. Wagner was not competent to testify on to the cause of Ms. Rudder's death, which it eventually did. The evidence also shows that Dr. Sperry was unavailable during the specific time frame in which his testimony was needed, i.e., prior to the hearing on Defendant's Renewed Motion. Under the circumstances presented, the desire to avoid incurring the cost of securing Dr. Sperry's assistance was not inappropriate. The record shows that, when the trial court ruled determined that Dr. Wagner was not competent to provide an opinion on causation at the summary judgment stage, Plaintiffs promptly submitted Dr. Sperry's declaration and *curriculum vitae*.

### B.      The importance of the new evidence to the Plaintiffs' case

In support of its Renewed Motion, Defendant offered Dr. Donna Seger, whose *curriculum vitae* recited that she holds positions as an Associate Professor of Clinical Medicine and Emergency Medicine in the Department of Medicine and Emergency Medicine at Vanderbilt University Medical Center; that she is the Medical and Executive Director of the Tennessee Poison Center at Vanderbilt University Medical Center; that she has had substantial experience in the field of toxicology, including a position as the fellowship director for toxicology at Vanderbilt University; that she has had training as a "clinical fellow" emphasizing in toxicology at the University of Cincinnati Medical Center; that she is board certified in toxicology; and that she holds membership in the American Academy of Clinical Toxicology, European Association of Clinical Toxicologists and Poison Centres, and the American College of Medical Toxicology. Additionally, Dr. Seger stated that she is "intimately familiar with drug withdrawal and its signs and symptoms, particularly drug withdrawal from benzodiazepines, commonly known as Xanex." She opined that Ms. Rudder's death was due to "a cardiac event, most likely an arrhythmia." Dr. Sperry's declaration is critical to Plaintiff's case because his opinion on causation expressed therein raises a genuine issue of material fact.

To prevail in a health care liability action, a plaintiff has the burden of proving:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant

---

[9] Because Defendant had filed the affidavit if Dr. Seger, in which she opined that Ms. Rudder's death was most likely caused by a cardiac event, Plaintiffs had to come forth with evidence sufficient to create a genuine issue of material fact on the issue of causation. *See Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235,265 (Tenn. 2015).

9

practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tennessee Code Annotated § 29-26-115(a). These elements must generally[10] be proved by expert testimony, and the expert must satisfy the three components of Tennessee Code Annotated section 29-26-115(b):

The proposed expert must (1) be licensed to practice in Tennessee or one of its eight contiguous bordering states; (2) practice a profession or specialty which would make the individual's expert testimony relevant to the issues in the case; and (3) have practiced this profession or specialty in one of these states during the year preceding the date of the alleged injury or wrongful act.

*Mitchell v. Jackson Clinic, P.A.*, 420 S.W.3d 1, 7 (Tenn. Ct. App. 2013) (citing *Shipley v. Williams*, 350 S.W.3d 527, 550 (Tenn. 2011). As Our Supreme Court has held:

[T]he *only* grounds for disqualifying a medical expert as incompetent to testify are (1) that the witness was not licensed to practice in Tennessee, Georgia, Alabama, Mississippi, Arkansas, Missouri, Kentucky, North Carolina, or Virginia; (2) that the witness was not licensed to practice a profession or specialty that would make the person's expert testimony relevant to the issues in the case; or (3) that the witness did not practice this profession in one of these states during the year preceding the date of the alleged injury or wrongful act.

*Shipley*, 350 S.W.3d at 550 (citing § 29-26-115(b)).

In his declaration, Dr. Sperry states that he has been "licensed to practice in the State of Georgia [and has] been continually licensed and actively practicing as a pathologist since 1985," including the year preceding Ms. Rudder's death, during which

---

[10] One exception is where the health care providers "alleged acts of negligence are so obvious that they come within the common knowledge of laymen." *Cox v. M.A. Primary & Urgent Care Clinic*, 313 S.W.3d 240, 262 (Tenn. 2010) (citing *Kennedy v. Holder*, 1 S.W.3d 670, 672 (Tenn. Ct. App. 1999)).

10

time he was the Chief Medical Examiner for the State of Georgia; that he is board certified in Anatomic, Clinical, and Forensic Pathology;[11] that he holds both a residency and fellowship in the field of pathology; that he has served as a professor of pathology at the Medical College of Georgia; and that he is a fellow the American Society of Clinical Pathologists, the National Association of Medical Examiners, the American Academy of Forensic Sciences, and the College of American Pathologists. Specifically relevant to this case, Dr. Sperry states in his declaration that he is familiar with "drug withdrawal and its signs and symptoms, particularly drug withdrawal from prescription medications including benzodiazepines (Xanax), Roxicodone, nordiazepam and morphine." Based on that experience and the materials he reviewed,[12] Dr. Sperry concluded:

> 5. It is my opinion that Ms. Rudder died as a result of withdrawal from the above prescription medications. The video of Ms. Rudder while in isolation shows that she was shivering, agitated, anxious, unable to sleep and suffering from protracted vomiting and diarrhea—all of which go along with drug withdrawal. The toxicology findings on the autopsy also support my opinion that Mrs. Rudder's death was caused by drug withdrawal. The autopsy report shows that there are no narcotics in her blood, which tells me that she had metabolized all of the drugs which she disclosed she had been taking, as well as any other narcotic drugs which she may have not disclosed, which would precipitate her into withdrawal.

---

[11] Generally, pathology is "a medical science, and specialty practice, concerned with all aspects of disease, but with special reference to the essential nature, causes, and development of abnormal conditions, as well as the structural and functional changes that result from the disease processes. Jefferson Law Book Company, Stedman's Medical Dictionary 1041 (William H. L. Dornete, M.D., J.D., ed., 5th ed. 1984). A pathologist is a physician "who specializes in anatomical, experimental, or clinical pathology and practices chiefly in the laboratory as a consultant to clinical colleagues, especially with reference to histologic diagnoses on tissue removed for biopsy, selection of diagnostic tests and interpretation of laboratory results, performing postmortem studies, and designing and participating in research of various types." *Id.* The more specific field of clinical pathology is defined as:

> (1) . . . any part of the medical practice of pathology as it pertains to the care of patients;
> (2) the subspecialty in pathology concerned with the theoretical and technical aspects of chemistry, bacteriology, virology, mycology, parasitology, immunology, hematology, biophysics, and so on, as they pertain to the diagnosis of disease and the care of patients, as well as to the prevention of disease and welfare of the community.

*Id.*

[12] Those materials being: "Autopsy Report and Death Certificate of Pamela Rudder; Affidavit of Donna Seger, M.D.; Affidavit of Nurse Kovacs-Whaley, R.N.; Mrs. Rudder's jail and medical records; jail videotape surrounding Ms. Rudder's actions and conduct while she was in isolation at the Hickman County jail up to the time of her death."

11

6. I disagree with Dr. Seger's that opinion that Ms. Rudder had hypertensive heart disease. Dr. Seger's opinion appears to be based on the death certificate which incorrectly listed Mrs. Rudder's cause of death as hypertensive and arteriosclerotic heart disease. The autopsy report contains no pathologic findings of hypertension or arteriosclerosis.

7. The autopsy findings do not support hypertension because Mrs. Rudder's heart was not enlarged and the left ventricle measurement is normal (1.2 centimeters). The autopsy report does not support arteriosclerosis because her arteries were found to be completely wide-open. The coronary arteries are described as having unobstructed ostia (openings) and follow usual distributions and are without significant arteriosclerosis.

8. I agree with Dr. Seger's opinion that Mrs Rudder likely died from a cardiac event, most likely an arrhythmia. The cardiac arrhythmia, however, was caused by nausea, vomiting, diarrhea and withdrawal from prescription medications and not hypertension or heart disease.

9. I disagree with Dr. Seger's opinion that the vital signs are totally inconsistent with someone experiencing drug withdrawal. While it is unclear, [sic] from the record when the vitals were taken, assuming that they were taken on December 15, her hypotensive (low) blood pressure is supportive of her being dehydrated and the vitals do not rule out Mrs. Rudder's death being caused by medication withdrawal.

10. It is my opinion, that Ms. Rudder's death was, more likely than not, proximately caused by nurse Tonic Cloud R.N.'s failure to act with ordinary and reasonable care in accordance with the standard of care—as testified to by Nurse Kovacs-Whaley. (Aff. of C. Kovacs-Whaley at 2-3, ¶ 9.) If Mrs. Rudder's medication withdrawal symptoms had been appropriately treated, Mrs. Rudder more likely than not would not have died from medication withdrawal on December 16, 2011.

Defendant argues that Dr. Sperry's "declaration still falls short of being able to create a material question of fact" because "[n]owhere in his declaration nor his CV is there any indication that Dr. Sperry has ever treated a live patient," Dr. Sperry "is not trained in toxicology or pharmacology" and he therefore "has no relevant experience concerning the matters about which he is testifying, namely the signs and symptoms of drug withdrawal of a live patient." We do not agree. Plaintiffs *were not* required to produce an expert witness who specialized in "toxicology" or whose practice regular involves the treatment of "live patient[s]"; Plaintiffs *were only* required to produce an expert witness who "is licensed to practice a profession or specialty that would make the person's expert testimony relevant to the issues in the case." *Shipley*, 350 S.W.3d at 550

(citing Tenn. Code Ann. § 29-26-115(b)); *accord Walker v. Bell*, 828 S.W.2d 409, 412 (Tenn. Ct. App. 1991) (recognizing that section 115 does not require "an expert witness to be in the same specialty as the defendant; the only requirement is that the witness be licensed in a profession that would make his expert testimony relevant to the issues in the case."). Dr. Sperry's declaration and *curriculum vitae* satisfy that burden. Dr. Sperry served as Chief Medical Examiner for the State of Georgia, a position which would require him the make inquiries into the "the cause, manner, and circumstances of death." Ga. Code Ann. § 45-16-25 (West 2017). Further, Defendant has not presented any evidence from which we could conclude that toxicology is the only possible medical specialty that would make an expert's testimony relevant; for us to hold so would raise Plaintiffs' burden above what the statute and pertinent case law require. As the Supreme Court recognized in *Shipley*, once a determination is made that an expert witness meets the minimum statutory requirements, i.e., practice in a specialty that makes the witnesses testimony relevant, "any questions the trial court may have about the extent of the witness's knowledge, skill, experience, training, or education pertain only to the weight of the testimony, not to its admissibility. 350 S.W.3d at 551 (citing *Stovall*, 113 S.W.3d at 725). Dr. Sperry's declaration and *curriculum vitae* show that he was competent to testify under section 115. Additionally, we hold that if this evidence had been considered by the trial court at the summary judgment stage, a genuine issue of material fact on the element of causation precluding summary judgment to Defendant would have been created.

## C.      The unfair prejudice to the Defendant

On appeal, Defendant has not identified any prejudice that would befall it in the event that the April 4 Order was amended based on Plaintiffs' newly submitted evidence. This is not a case in which the newly submitted evidence was readily available to the Plaintiffs. *Caudill v. Clarksville Health Sys., GP,* No. M2016-02532-COA-R3-CV, 2017 WL 4457590, at *7 (Tenn. Ct. App. Oct. 5, 2017) ("[W]here information was 'clearly available' to a litigant prior to the judgment, allowing a litigant to rely on that evidence in a motion to alter or amend 'would result in unfair prejudice to the [party opposing the motion to alter or amend].'") (quoting *Haynes v. Lunsford*, No. E2015-01686-COA-R3-CV, 2017 WL 446987, at *5 (Tenn. Ct. App. Feb. 2, 2017)). Nor is this a case where Plaintiffs were not able to obtain new evidence to support their motion to alter or amend. *See Smith v. Haley*, No. E2000-001203-COA-R3-CV, 2001 WL 208515, at *6 (Tenn. Ct. App. Mar. 2, 2001). Further, from our review of the record, it does not appear that a trial date has been set or that expert depositions have been taken.

Applying the *Stovall* factors to the facts presented, through the affidavit of their counsel Plaintiffs explained that they attempted to obtain Dr. Sperry's declaration as soon as they knew it might be necessary for purposes of responding to Defendant's summary judgment motion, and the reason they were unable to obtain it before the November 2, 2015 hearing; further, that counsel informed the trial court and Defendant of Plaintiff's

13

desire to obtain Dr. Sperry's declaration if the trial court felt that Defendant was entitled to summary judgment. The declaration creates a genuine issue of material fact as to causation.

A court abuses its discretion when it bases a decision on a clearly erroneous assessment of the evidence. *Lee Med.*, 312 S.W.3d at 524. As noted above, Dr. Sperry's declaration creates a genuine issue of material fact on causation; the denial of the motion deprived the trial court of this crucial evidence which would preclude Defendant from being granted summary judgment. Given the policy of our courts to hear cases on their merits, and in the absence of unfair prejudice to Defendant, the interests of justice would have been promoted had the court granted the motion to revise.[13]

## III. LOANED SERVANT DEFENSE

Plaintiffs and Defendant appeal the denial of their respective motions for summary judgment on the loaned servant defense. Plaintiffs argue that the defense fails as a matter of law because "the plain and unambiguous language of the contract between [Defendant] and Hickman County establishes that Nurse Cloud, as a matter of law, cannot be the loaned servant of Hickman County" and because the defense is barred on the grounds of *res judicata*. The trial court ruled that the contract only identified the relationship between Hickman County and Defendant and "did not define the relationship between [Defendant] and Nurse Cloud."

As to Defendant's motion the court ruled that a genuine issue of material fact precluded summary judgment:

---

[13] As noted in *Chambers ex rel. Chambers v. Bradley County*:

> Tennessee courts have long recognized that the interests of justice are promoted by providing injured persons an opportunity to have their lawsuits heard and evaluated on the merits. The Supreme Court observed in 1937 that "[w]e have stated repeatedly that it is the policy of this court to have controversies between litigants determined upon their merits." *Fiske v. Grider,* 171 Tenn. 565, 106 S.W.2d 553, 555 (Tenn. 1937); *see also Henry,* 104 S.W.3d at 481 ("in the interests of justice, courts express a clear preference for a trial on the merits"); *Henley v. Cobb,* 916 S.W.2d 915, 916 (Tenn. 1996) ("It is well settled that Tennessee law strongly favors the resolution of all disputes on their merits"); *Childress v. Bennett,* 816 S.W.2d 314, 316 (Tenn. 1991) ("it is the general rule that courts are reluctant to give effect to rules of procedure which seem harsh and unfair, and which prevent a litigant from having a claim adjudicated upon its merits"); *Tenn. Dep't of Human Servs. v. Barbee,* 689 S.W.2d 863, 866 (Tenn. 1985) ("the interests of justice are best served by a trial on the merits"); *Stevens,* 418 S.W.3d 547, 2013 WL 6158000 at *8 (quoting and reaffirming general rule stated in *Childress* ).

No. E2013-01064-COA-R10-CV, 2014 WL 1266101, at *5 (Tenn. Ct. App. Mar. 28, 2014).

For their part, Plaintiffs have quoted the deposition of Nurse Glenn defining Nurse Cloud's job description as follows: "Follows hospital and departmental policies and procedures at all times." With this quote, Plaintiffs have raised a genuine issue regarding the very material fact as to who actually controlled Nurse Cloud.

Defendant argues that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on the defense.

Relative to the defense, in its answer to the second amended complaint, Defendant asserted:

19. The allegations of paragraph 19 are denied as stated. HCH admits that Nurse Cloud was loaned by HCH to Hickman County pursuant to a services agreement between HCH and Hickman County to assist County in providing health care services inmates of the Hickman County Jail. HCH affirmatively asserts that when Nurse Cloud provided nursing services at the Hickman County Jail, she did so on behalf of and in the course and scope of her specific loaned servant relationship with Hickman County and not in the course and scope of her general employment as a nurse for HCH.
* * *

83. HCH affirmatively asserts that it cannot be held liable for the conduct of Nurse Cloud because at all relevant times she was acting as the loaned servant of Hickman County, as described in paragraph 19, above.

The pertinent portion of the contract between Hickman County and Defendant stated:

The relationship between Hospital and County is solely that of independent contractors. Nothing in this Agreement or otherwise will be construed or deemed to create any other relationship, including one of employment, agency, or joint venture.

Generally, an employer can be held liable for the negligence of an employee acting within the scope of their employment under the doctrine of *respondeat superior*. *White v. Revco Disc. Drug Centers, Inc.*, 33 S.W.3d 713, 718 (Tenn. 2000). In some cases however, the liability of an employer can be shifted to another employer where the "loaned servant" doctrine applies. *Arrow Elecs. v. Adecco Employment Servs., Inc.*, 195 S.W.3d 646, 651 (Tenn. Ct. App. 2005) (citing *Parker v. Vanderbilt Univ.*, 767 S.W.2d 412, 416 (Tenn. Ct. App.1988)). This doctrine is applicable where "a general employer 'loans' his agent to a special employer, thereby giving the special employer control over the agent, along with responsibility for the agent's actions or omissions." *Gager v. River Park Hosp.*, No. M2009-02165-COA-R3-CV, 2010 WL 4244351, at *6 (Tenn. Ct. App.

15

Oct. 26, 2010) (citations omitted); *see also Gaston v. Sharpe*, 168 S.W.2d 784, 786 (Tenn. 1943) ("[A] servant at a particular time may remain under the control of his general employer for some purposes and yet be under the control of a special employer for others. Likewise it sometimes happens that a particular work in which the servant is engaged may be properly considered as the work or business of both the general employer and the special employer."). To determine whether an employee is a "loaned servant" we apply the test set out by our Supreme Court in *Gaston v. Sharpe*:

> Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other. . . The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case.

168 S.W.2d at 786 (Tenn. 1943) (quoting Restatement of Agency, § 227).

Plaintiffs argue that the contract between Hickman County and Defendant precludes application of the "loaned servant" defense; in support of their motion they filed a Statement of Undisputed Material Facts in accordance with Tennessee Rule of Civil Procedure 56.03[14] stating:

> 1. Mr. Keller attached to his declaration a copy of the contract between HCH and Hickman County, which stated in relevant part: "The relationship between Hospital and County is solely that of independent contractors. Nothing in this Agreement or otherwise will be construed or deemed to create any other relationship, including one of employment, agency, or joint venture." (HCH Contract with Hickman County, at 2)
>
> **RESPONSE:** Objection. This selected portion of the contract term seeks to define the relationship between Hickman County and the defendant, rather than Hickman County and Nurse Cloud, and is therefore irrelevant to the inquiry pertaining to the loaned servant doctrine. Further, the entire contract between the defendant and Hickman County needs to be considered in connection with this issue.

---

[14] In the memorandum in support of the motion, Plaintiffs also relied on the contract between Defendant and Hickman County and the transcript of a hearing on and order granting the motion which resulted in the dismissal of Saint Thomas Health, Ascension Health, and Millennium Medical Trust, Inc.

Without waiving this objection, the defendant responds as follows: Admitted.

2. There's no proof that Nurse Cloud was controlled or was supervised by anyone other than the chief nursing officer or the other employees at Hickman Community Hospital as it related to her provision of nursing services to jail inmates including their decedent. (Dec. 20, 2013 Hr'g Tr. at 12:2-10)

**RESPONSE:** Objection. The cited reference for this alleged undisputed material fact comes from oral argument made by counsel for the defendant in connection with the defendant's motion to dismiss and motion for summary judgment related to the plaintiffs' efforts to establish venue in Davidson County, Tennessee. Statements of counsel during oral argument are not evidence nor does any statement made by counsel during that hearing in any way create an admission on the issue of the loaned servant doctrine.

Without waiving this objection, the defendant responds as follows: Denied. (Depositions of Tonie Cloud, RN and Dawn Glenn, NP; Affidavits of Robin Crowell and Tonie Cloud, RN; Declaration of Dawn Glenn, NP).

3. There appears to be no evidence that Nurse Cloud was actually controlled by anyone at the Hickman County Jail or that her allegiance was with anyone other than Defendant in all circumstances. (Mem. and Order at 12, Pls.' Not. Filing, Ex. 7)

**RESPONSE:** Objection. The citation to the Court's memorandum and order is not evidence, but rather the Court's ruling based upon evidence presented in connection with the defendant's first motion for summary judgment that included the assertion of the loaned servant doctrine. The defendant has filed a renewed and supplemental motion for summary judgment with supporting evidence that cures the deficiencies in the first motion as pointed out in the Court's memorandum and order dated October 27, 2014.

Without waiving this objection, the defendant responds as follows: Denied. (Affidavit and Deposition of Tonie Cloud, RN; Deposition and Declaration of Dawn Glenn, NP; Affidavit of Robin Crowell).

While Plaintiffs argue that they are entitled to judgment as a matter of law, they fail to acknowledge the effect of Defendant's denial of asserted facts 2 and 3 or to discuss the disputed facts. Summary judgment is appropriate only when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no* genuine issue as to *any* material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04 (emphasis added). Inasmuch as Plaintiffs have not shown the absence of a genuine issue of material fact, they are not entitled to summary judgment on this issue.

We also address Plaintiffs' argument, based on *Parker v. Vanderbilt University* that the particular language in the contract between Defendant and Hickman County precludes application of the defense. 767 S.W.2d at 412. In that medical malpractice action, Vanderbilt University had been sued by the representatives of a person who suffered severe brain damage during surgery performed by doctors furnished to Nashville General Hospital by Vanderbilt under a contract with the Metropolitan Government. The contract provided that Vanderbilt would provide surgical staff to Nashville General; that Nashville General had the right to approve all medical staff; and that all residents "loaned" as part of the agreement were supervised by and accountable to Nashville General. The agreement further provided that the surgical staff, i.e., the "loaned servants," would be "accountable solely to [Nashville] General." *Id.* at 417. Accordingly, the court held that the Vanderbilt surgeons were loaned servants and any negligence could not be imputed to Vanderbilt.

Unlike the contract in Parker, the contract between Defendant and Hickman County only speaks to the relationship between Defendant and Hickman County and does not address the extent and degree of control Hickman County may had over Nurse Cloud. Therefore, the contract between Defendant and Hickman County does not preclude the "loaned servant" defense as a matter of law because the contract does not settle the issue of who actually controlled Nurse Cloud in her provision of medical services.

Plaintiffs next argue that Defendant is barred from asserting a "loaned servant" defense by *res judicata*. "*Res judicata* bars a second suit between the same parties on the same cause of action with regard to all issues that were or could have been litigated in the former suit." *Lee v. Hall*, 790 S.W.2d 293, 294 (Tenn. Ct. App. 1990) (citations omitted). A party asserting that an issue is barred by *res judicata* must show: "(1) that the underlying judgment was rendered by a court of competent jurisdiction; (2) that the same parties were involved in both suits; (3) that the same cause of action was involved in both suits; and (4) that the underlying judgment was on the merits." *Id.*

While this case was pending in Davidson County Circuit Court, Saint Thomas Health, Ascension Health, and Millennium Medical Trust moved to dismiss the action against them on the grounds that they were not proper parties and that venue was improper in Davidson County; the court converted their motion to a motion for summary judgment and granted the motion. Plaintiffs' *res judicata* argument hinges on their contention that the issue of who controlled Nurse Cloud's action was central to the ruling on the motion for summary judgment. This argument is without merit. The motion only

18

asked the court to decide whether Saint Thomas, Ascension, and Millennium Medical Trust should be dismissed as improper parties, and did not raise or resolve the issue of who, between Defendant and Hickman County, controlled Nurse Cloud. In granting the motion, the court held:

> [Saint Thomas Health, Ascension Health, and Millennium Medical Trust] are not proper parties to this proceeding and thus there is no material question of fact as to whether these defendants should be parties to this proceeding, including there being no question of material fact on whether the corporate identities of these defendants should be disregarded as the alter egos of the defendant, Hickman Community Healthcare Services, Inc. d/b/a Hickman Community Hospital.

Moreover, at the time that motion was granted, Defendant had not filed an answer and therefore had not pled its "loaned servant" defense; the question was not at issue. As we are instructed by our Supreme Court, "a judgment or decree is res judicata only as to the matters in issue; the adjudication, to be conclusive, should be upon the very point brought directly in issue by the pleadings; and a party will not be prejudiced by a judgment as to rights not then accrued." *White v. White*, 876 S.W.2d 837, 839–40 (Tenn. 1994) (citing 22 Tennessee Jurisprudence, Res Judicata, ¶ 28 at 840 (1985)). For these reasons, the defense is not barred by *res judicata*.

With respect to its motion, Defendant argues that there is not a genuine issue of fact that Hickman County, not the Defendant, exercised control over Nurse Cloud in her capacity as a nurse at the jail. The burden on a defendant asserting a loaned servant defense was set forth in *Chamberlain v. Lee*:

> In order to escape responsibility for the negligence of [a] servant on the theory that the servant has been loaned, the original master must resign full control of the servant for the time being. It is not sufficient that the servant is partially under the control of a third person.

257 S.W. 415, 417 (1924). Therefore, at the summary judgment stage, it was Defendant's burden to show that there is no genuine issue of material fact that it "resign[ed] full control" over Nurse Cloud to Hickman County. Upon our review of the record, we agree with the trial court that summary judgment to Defendant on this ground was inappropriate because there is a genuine issue of material fact as to who actually controlled Nurse Cloud and to what degree.

In support of its argument, Defendant cites to its Rule 56.03 statement of undisputed facts:

19

1. By letter agreement dated June 29, 2008, HCH entered into a contract with Hickman County to provide medical services to the Hickman County jail that consisted of the provision of a nurse, a nurse practitioner, and a medical doctor to serve as Medical Director. (Keller Dec.; contract attached).

RESPONSE: Undisputed for the purposes of this motion.

7. Robin Crowell, RN, BSN, MHSA, was the Chief Nursing Officer for HCH in December of 2011 at the time of Pamela Rudder's death while in the Hickman County jail.

RESPONSE: Undisputed.

12. Nurse Cloud, RN, is the only person that the plaintiffs have identified for whom they are seeking to impose liability against HCH in their second amended complaint. (Second Amended Complaint).

RESPONSE: Undisputed. However, Plaintiffs' proposed Third Amended Complaint contains independent allegations of negligence against HCH for negligent training and supervision.

Relevant to this issue, Dawn Glenn testified in her deposition that she was employed by Defendant as a nurse practitioner; that, in that capacity, she worked in both a clinic that was part of Defendant's hospital and at the Hickman County Jail; that Dr. John Thomas Sexton, who was also employed by Defendant, supervised the treatment she provided to the inmates at the jail; that Nurse Cloud's supervisor in December 2011 was Robin Crowell, the chief nursing officer for Defendant, and that Nurse Glenn also supervised Nurse Cloud by answering questions or concerns that Nurse Cloud had about the treatment of inmates. Nurse Glenn also confirmed that Nurse Cloud's job description included a mandate that she "follow[] hospital and departmental policies and procedures at all times" and that the full extent of Hickman County's involvement with Nurse Cloud in the exercise of her duties was for jail personnel to provide security, transport inmates to the clinic, then return inmates back to their "pods" after examination in the clinic. In a declaration submitted after her deposition Nurse Glenn stated:

While working at the Hickman County jail, there was no one at Hickman Community Hospital who had any supervisory authority over how we treated inmates as a registered nurse, nurse practitioner, or medical doctor. Inmates were seen pursuant to the jails policies and with the use of the jails facilities and equipment.

20

In her affidavit, Robin Crowell stated that she was the chief nursing officer for Defendant in December 2011, and that "no one employed by Hickman County told Nurse Cloud how to practice nursing and to treat patients, which was performed by Nurse Cloud based upon her training and experience as a nurse" and "all of Nurse Cloud's duties at the jail were governed by the jail policies and instructions from jail personnel." In her deposition, Nurse Crowell testified that the "State of Tennessee" supervised Nurse Cloud's "nursing treatment", explaining:

> The policies and procedures for any medical care for any inmate is -- those policies come from the State of Tennessee. It dictates when an inmate can be seen by a medical provider, when they can have medication. So she was strictly under their policies and procedures, not the hospital. And then also, she's a licensed registered nurse, which means she's licensed to perform a nursing assessment, to plan and to organize a patient's care based upon her own licensure. She's not supervised on how to perform a nursing assessment.

Nurse Crowell also stated in her affidavit that "all of the equipment and supplies used by Nurse Cloud in connection with her care and treatment of inmates was provided by the Hickman County jail. Nothing was provided by Hickman Community Hospital."

Nurse Cloud testified in her deposition that part of her official job description was to "[c]oordinate[] any other staff functions within the framework of the policies and procedures[15] and within the legal frame work of the State of Tennessee." A document entitled "Job Description" was entered as an exhibit to her deposition, which contains the requirements for a "RN – Correctional," one of which was to "[f]ollow[] hospital and departmental policies and procedures at all times." Plaintiffs filed another deposition of Nurse Cloud, which was taken as part of a separate case. In that deposition, Nurse Cloud testified that Nurse Glenn and Nurse Crowell directed her activities at the jail; that, in setting up the clinic at the jail, she took out Defendant's equipment, i.e. "our blood pressure, monitors, scale, stuff like that"; and that the jail did not decree what equipment was needed for the clinic.

The evidence does not provide a clear answer to the question of who directed Nurse Cloud's treatment. Nurse Cloud's and Nurse Crowell's testimonies directly contradict each other about which entity, Defendant or Hickman County, provided the equipment at the clinic in the jail. Further, Nurse Glenn testified in her deposition that she "supervised" Nurse Cloud's treatment of inmates but later submits a declaration that "no one at Hickman County Hospital" had "any supervisory authority over how" Nurse

---

[15] She further testified that the she understood the referenced policies and procedures to mean Defendant's policies and procedures.

21

Cloud treated inmates. In addition, Nurse Crowell stated in her affidavit that Nurse Cloud was completely governed by jail policies; however, Nurse Crowell also explains that "no one employed by Hickman County told Nurse Cloud how to practice nursing and to treat patients." Nurse Crowell also testified in her deposition that the State of Tennessee directed Nurse Cloud's treatment of patients; however, Nurse Cloud testified in her deposition that Nurse Crowell and Nurse Glenn directed her activities. The testimonies conflict, creating a genuine issue of fact as to "whether it was understood between [Nurse Cloud] and [Defendant] that [s]he is to remain in the allegiance of [Defendant] . . . or is to be . . . subject to the direction of [Hickman County]." *See Gaston*, 168 S.W.2d at 786.

There is a genuine issue of material fact that precludes summary judgment on this issue, and the trial court did not err by denying Plaintiffs' Loaned Servant Defense Motion or by denying Defendant's Renewed Motion for Summary Judgment on the loaned servant defense issue.

## IV. SETTLEMENT AGREEMENT

In its First Motion for Summary Judgment Defendant argued Plaintiffs' case should be dismissed because it had been released from liability under the terms of the "'Full, Final, and Absolute, Release and Settlement Agreement" (the "Agreement"), which was executed by Hickman County, Plaintiffs, and Matthew Bilbery.[16] Specifically, Defendant argued that it was directly released by the terms of the Agreement and, even if not directly released, Nurse Cloud was released, and Defendant cannot be vicariously liable for an agent who was released; the trial court denied the motion, finding three genuine issues of material fact. Defendant reiterates those arguments on appeal.

A "settlement" or "release" is "a contract and the rules of construction applied to contracts are used in construing a release." *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct. App. 1991). "'[A] release ordinarily covers all such matters as may fairly be said to have been within the contemplation of the parties when it was given . . . .'" *Peatross v. Shelby Cty.*, No. W2008-02385-COA-R3-CV, 2009 WL 2922797, at *3 (Tenn. Ct. App. Sept. 10, 2009) (quoting *Jackson v. Miller*, 776 S.W.2d 115, 118 (Tenn. Ct. App. 1989)). We have further explained the analysis a court must undertake in interpreting a settlement agreement:

---

[16] Defendant also argued in its first Motion for Summary Judgment that Plaintiffs' claims should be dismissed because they could not show the standard of care required of Nurse Cloud and could not show any deviation from that standard. The trial court denied Defendant's motion on that ground, and it is not at issue in this appeal.

22

The scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument, considered in the light of all the facts and circumstances. The intention of the parties is to be gathered from the entire instrument and in such inquiry that construction will be adopted which gives effect to each and every part of the instrument where that is possible. In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that the intention of the parties shall govern and this intention is to be determined with a consideration of what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in the light of all of the surrounding facts and circumstances under which the parties acted.

*Evans v. Tillett Bros. Constr. Co., Inc.*, 545 S.W.2d 8, 11 (Tenn. Ct. App. 1976). Because the interpretation of a contract is a question of law, "[t]his court must review the document ourselves and make our own determination regarding its meaning and legal import." *Pylant v. Spivey*, 174 S.W.3d 143, 150-51 (Tenn. Ct. App. 2003) (citing *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993)).

Accordingly, we must first "consider the language of the" the Agreement. *Peatross*, 2009 WL 2922797 at *3. Then "we must examine the facts and circumstances surrounding the execution of the Release," considering the affidavits offered by the parties to determine the intent of Hickman County and Plaintiffs in signing the Agreement. *Id.* "If a trier of fact could draw different inferences about their intent, summary judgment is inappropriate." *Id.* (citing *Evans,* 545 S.W.2d at 12).

The pertinent language in the Agreement states:

That the undersigned, BONNIE HARMON, JENNY FAGAN, EDWARD EAGAN and MATTHEW BILBREY, Children as next of kin of PAMELA RUDDER, deceased. ("Releasing Parties"), for the sole consideration of Seventy-Five Thousand Dollars ($75,000.00) to us paid in hand paid, the receipt whereof is hereby acknowledged, do hereby remise, release, and forever discharges HICKMAN COUNTY, TENNESSEE, RANDAL WARD, FELICIA ROBERSON and SONDRA LUNA ("Released Parties"), their successors and assigns, heirs, executors, administrators, agents/insurers, affiliates, employers, and all other persons, firms, and corporations of and from any and all claims, demands, rights and causes of action of whatsoever kind and nature, arising from and by reason of any and all known and unknown, foreseen and unforeseen, bodily injury or the consequences thereof, including emotional distress, resulting and to result, from the arrest, detention, treatment and ultimate death of Pamela Rudder between December 11, 2011 and December 16, 2011, which is referred to

23

and described in the following lawsuits: *Bonnie Harmon, et al. v, Hickman County, et al*., Hickman County Circuit Court, Case No. 12-cv-70; *Bonnie Harmon, et al. v. Hickman County, et al*., Hickman County Circuit Court, Case Na. 13-cv-25; *Bonnie Harmon, et al. v. Hickman County, et al*., United States District Court for the Middle District of Tennessee, Case No. 1:13-cv-00002; and *Bonnie Harmon, et al. v. Hickman County, et al*., United States District Court for the Middle District of Tennessee, Case No. 1:13-ev-00042 (collectively referred to as the "Lawsuits"). In the Lawsuits, Releasing Parties have claimed the Released Parties to be legally liable, which liability is hereby expressly denied.

At the time the Agreement was signed on March 21, 2014, there were five suits pending to recover for the death of Ms. Rudder. Two of those suits were brought in Hickman County Circuit Court and two in the United States District Court for the Middle District of Tennessee (the "Hickman County suits"). The parties in the Hickman County suits were identical, with Bonnie Harmon, Jenny Fagan, Edward Fagan, and Matthew Bilbrey as plaintiffs, and Hickman County, Randal Ward, Sondra Luna, and Felicia Roberson were defendants.[17] Consistent with their designations in the suits, Bonnie Harmon, Jenny Fagan, Edward Fagan, and Matthew Bilbrey are the "Releasing Parties," and Hickman County, Randal Ward, Sondra Luna, and Felicia Roberson, are the "Released Parties." Generally, the Agreement describes the event giving rise to the controversy, names the four suits being settled, and lists the people and entities that benefit from the Agreement.

Neither Nurse Cloud nor Defendant are named as parties in the Hickman County Suits or designated as "Released Parties" in the Agreement; no non-governmental official or entity is included as a defendant in the suits or as a "Released Party" in the Agreement. The Agreement does not define the group of people to whom the Agreement extends, e.g., whether it is meant to cover only employees of Hickman County or whether it is meant to cover all those for whom Hickman County could be vicariously liable. This suit was filed on April 11, 2013, and, after signing the Agreement, Plaintiffs continued to litigate this case, filing a Second Amended Complaint less than two months later. There is nothing from the express language of the Agreement from which to conclude that this suit or any party to this suit was intended to be included as a "Released Party."

Defendant argues that Nurse Cloud was released because she was an agent of Hickman County; the question of whether an agency relationship existed, however, is itself an issue of fact:

---

[17] The caption of those cases listed Randal Ward as the Sheriff of Hickman County and Sondra Luna and Felicia Roberson as "[d]eputy sheriffs and [c]orrectional [o]fficers of Hickman County Jail."

The existence of an agency relationship, however, "is a question of fact under the circumstances of the particular case," and is determined by examination of agreements among the parties or of the parties' actions. Id. The principal's right to control the acts of the agent is a relevant factor when determining the existence of an agency relationship. The amount of actual control exercised by the principal over the agent also may be determinative of whether an agency relationship exists.

*Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 343 (Tenn. 2002) (citations omitted). And, as we held in our discussion of the loaned servant defense, there is a genuine dispute of material fact as to the amount and degree of control that Hickman County had over Nurse Cloud's actions. For the same reasons, summary judgment is not appropriate on this ground.

Defendant also argues that it is released from liability because it and Hickman County "are affiliated through their contractual relationship"; Defendant does not identify the manner in which this contractual relationship would release Defendant from liability under the terms of the Agreement. This court recognized in *Dolman v. Donovan*, No. W2015-00392-COA-R3-CV, 2015 WL 9315565, at \*4 (Tenn. Ct. App. Dec. 23, 2015), that "the term 'affiliate' may denote myriad affiliations." The contract between Defendant and Hickman County expressly defines the relationship between them as "independent contractors" and expressly disclaims any "other relationship, including one of agency or joint venture." Defendant does not cite to other evidence bearing on the intent of the parties to the Agreement in including the term "affiliate."

Finally, Defendant argues that it should be released as an entity included in the language "all other persons, firms, and corporations." They cite no evidence in support of this proposition. Having reviewed the record, we fail to see any evidence that, when the Settlement was executed, the parties specifically intended Defendant or Nurse Cloud to be included as an "other person[], firm[], and corporation[]" of any Released Party.

We hold that summary judgment was not appropriate on this basis.

## V. THIRD AMENDED COMPLAINT

A party may amend their pleadings by "written consent of the adverse party or by leave of the court"; when permission to amend is asked of the court, Tennessee Rule of Civil Procedure 15.01 instructs the court to given such leave freely "when justice so requires. This instruction is to be construed liberally, meaning that "the court should freely grant the amendment, so long as prejudice to the opposing party can be avoided." *Harden v. Danek Med., Inc.*, 985 S.W.2d 449, 454 (Tenn. Ct. App. 1998); *Campbell County Bd. of Educ. v. Brownlee–Kesterson, Inc.*, 677 S.W.2d 457 (Tenn. Ct. App. 1984). "Although leave to amend pleadings is to be freely given under Tenn. R. Civ. P. 15, trial courts are not required to grant such motions if 'the amendment would have been

futile.'" *McCullough v. Johnson City Emergency Physicians, P.C.,* 106 S.W.3d 36, 47 (Tenn. Ct. App. 2002) (quoting *Huntington Nat'l Bank v. Hooker*, 840 S.W.2d 916, 923 (Tenn. Ct. App. 1991). An amendment to add a claim is futile if the claim would be barred by the applicable statute of limitations unless the claim "relate[s] back" to the original pleading under Rule 15.03. *Ward v. Wilkinson Real Estate Advisors, Inc.*, No. E2013-01256-COA-R3CV, 2013 WL 6200179, at *4 (Tenn. Ct. App. Nov. 26, 2013) (Charles D. Susano, Jr., concurring).

Rule 15.03 provides a mechanism by which a party can assert new claims or add additionally parties via amendment, even where a statute of limitation has run:

> Whenever the claim or defense asserted in amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading

*Energy Sav. Products, Inc. v. Carney*, 737 S.W.2d 783, 784 (Tenn. Ct. App. 1987) ("An amended complaint under [Rule 15.03] avoids the impact of a statute of limitation . . . ."). A trial court's decision on a motion to amend a complaint will be reviewed under the abuse of discretion standard. *94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby Cty. Airport Auth.*, 169 S.W.3d 627, 639 (Tenn. Ct. App. 2004).

After Defendant filed its Renewed Motion for Summary Judgment, Plaintiffs moved to amend their Second Amended Complaint "in response to HCH's affirmative defense based on the loaned servant doctrine, and newly discovered evidence obtained in discovery," to assert a claim that Defendant was liable for the negligent training and supervision of Nurse Cloud; Plaintiffs had included this claim in the Initial Complaint and First Amended Complain, but not in the Second Amended Complaint. The trial court granted the motion, and held that the amendment related back to the filing of the initial complaint pursuant to Tennessee Rule of Civil Procedure 15.03, and that the amendment was not futile. Defendant contends that the claim asserted in the amendment is barred by the statute of limitations and that, accordingly, the amendment was futile and the motion to amend should have been denied.

We agree with the trial court that the claim asserted in the Third Amended Complaint relates back to the "conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading" and the amendment is not futile. First, Plaintiffs' claim that Defendant was negligent in its training and supervision of Nurse Cloud arises out of the same allegedly negligent conduct, i.e. Nurse Cloud's treatment of Ms. Rudder, complained of in the original complaint. In addition, the claim of negligent training and supervision of Nurse Cloud was actually included in the initial Complaint and the First Amended Complaint.

Defendant argues that Rule 15.03 does not apply and that we should apply Tennessee Code Annotated 28-1-105[18] and determine that the claim of negligent training and supervision of Nurse Cloud is barred by "the one year statute of limitations and three year statute of repose contained in Tenn. Code Ann. § 29-26-116."[19]

We do not agree with the Defendant's argument that the failure of Plaintiffs to include the claim of negligent training and supervision in the Second Amended Complaint operated as a dismissal of the claim, and that when Plaintiffs sought, more than a year after filing the Second Amended Complaint, to add the claim in the Third Amended Complaint, the one year limitation period at section 28-1-105 barred the claim. Plaintiffs did not enter a voluntary nonsuit when they did not include the claim in the Second Amended Complaint, and there was no other "judgment or decree . . . rendered against the plaintiff upon any ground" that concluded the right of action; there has not been any disposition of Plaintiffs' negligent training and experience claim and section 28-1-105 has not been triggered.[20]

The trial court did not abuse its discretion in granting Plaintiffs' motion to amend.

---

[18] Tennessee Code Annotated 28-1-105, commonly referred to as the "savings statute," provides that if an action "is commenced within the time limited by a rule or statute of limitation, but the judgment or decree is rendered against the plaintiff upon any ground not concluding the plaintiff's right of action . . . the plaintiff . . . may . . . commence a new action within one (1) year . . . ."

[19] In support of its argument, Defendant cites language in *Frazier v. East Tennessee Baptist Hospital, Inc.*, 55 S.W.3d 925 (Tenn. 2001), that the "Rule 15.03 applies separately from the [Tennessee Code Annotated section 28-1-105.]" 55 S.W.3d at 929.

[20] Citing *Christian v. Lapidus*, Defendant argues that the savings statute was triggered because Plaintiffs abandoned their negligent training and supervision claim by filing their Second Amended Complaint without it. 833 S.W.2d 71 (Tenn. 1992). We do not find *Christian* applicable here. In that case, the question was whether the statute of limitation had run on plaintiff's malicious prosecution claim. 883 S.W. 2d at 73. The *Christian* court held that the statute of limitations on the claim began to run when an amended complaint was filed in the underlying suit that removed the plaintiffs from the named defendants. *Id.* ("The legal effect was to remove the Christians from the lawsuit and constitute an abandonment of Defendants' RICO action against them.) Here, Plaintiffs' Second Amended Complaint did not abandon their suit against Defendant, but merely modified the claims. As our Supreme Court later acknowledged, "[i]n *Christian,* the issue was whether a plaintiff's abandonment of a civil lawsuit was a final and favorable termination that commenced the statute of limitations for a later malicious prosecution action, and the *Christian* decision "was limited to the procedural context of that case—a plaintiff's abandonment of the underlying civil proceeding." *Parrish v. Marquis*, 172 S.W.3d 526, 530 (Tenn. 2005), *overruled on other grounds by Himmelfarb v. Allain*, 380 S.W.3d 35 (Tenn. 2012). *Christian*'s subsequent limitation makes it inapplicable here.

## VI. CONCLUSION

For the foregoing reasons, we reverse the judgment denying Plaintiffs' Motion to Revise; in all other respects we affirm the judgment.

_____
RICHARD H. DINKINS, JUDGE